**Electronically Filed
Supreme Court
SCWC-13-0000182
06-OCT-2016
08:58 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

KILAKILA 'O HALEAKALĀ,
Petitioner/Plaintiff/Appellant-Appellant,

vs.

UNIVERSITY OF HAWAI'I and DAVID LASSNER, in his official capacity
as Chancellor of the University of Hawai'i at Manoa; BOARD OF
LAND AND NATURAL RESOURCES, SUZANNE CASE, in her capacity as the
Chairperson of the Board of Land and Natural Resources; and
DEPARTMENT OF LAND AND NATURAL RESOURCES,
Respondents/Defendants/Appellees-Appellees.[1]

SCWC-13-0000182

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-13-0000182; CIVIL NO. 10-1-2510)

OCTOBER 6, 2016

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY POLLACK, J.

---

[1]    Chancellor of the University of Hawai'i at Manoa David Lassner was automatically substituted as respondent/defendant/appellee-appellee in place of former Chancellor Robert Bley-Vroman.  State of Hawai'i Board of Land and Natural Resources (BLNR) chairperson Suzanne Case was automatically substituted as a respondent/defendant/appellee-appellee in place of former BLNR chairperson William J. Aila, Jr., who was sued in his official capacity. Hawai'i Rules of Appellate Procedure (HRAP) Rule 43(c)(1) (2010).

## I.    Introduction

Haleakalā, on the island of Maui, has been a site of great historical and cultural importance to Native Hawaiians for more than one thousand years.  Today, many consider Haleakalā as the most sacred place on Maui where numerous cultural practices continue, including religious ceremonies and prayer.  The summit of Haleakalā is also considered as one of the premier locations for astronomical research in the world and has been used for such purposes for over fifty years.  An 18.166 acre area set aside for astronomical research (Observatory Site) is located within a conservation district near the summit of Haleakalā.[2]

In 2004, a National Science Foundation working group identified the Observatory Site as the location for constructing a new telescope, the Advanced Technology Solar Telescope (Telescope Project).  Under the applicable administrative rules, approval of a management plan for the Observatory Site was a prerequisite for construction of the Telescope Project.  The University of Hawai'i (UH) prepared a Management Plan containing guidelines and management strategies that apply to all facilities within the astronomical site area.  An environmental assessment of the Management Plan was conducted to evaluate

---

[2]    Under the Governor's Executive Order No. 1987, the Observatory Site is under the control and management of the University of Hawaii's Board of Regents.

environmental impacts that may result from implementing the Management Plan. UH concluded that the Management Plan would not have a significant environmental impact and that, therefore, an environmental impact statement was not required under the Hawai'i Environmental Policy Act (HEPA). The Management Plan was then approved by the Board of Land and Natural Resources (BLNR).

Kilakila 'O Haleakalā (Kilakila), an organization that strives to protect the sacredness of the Haleakalā summit, initiated a court action to challenge UH's finding that the Management Plan would have no significant impact on the environment. Kilakila maintained that the environmental assessment did not comply with HEPA and that it did not consider the Telescope Project as a component of the Management Plan, nor as a secondary and cumulative impact of the Management Plan.

During the pendency of its court challenge, Kilakila filed discovery requests seeking to obtain documents and admissions from UH and the Department of Land and Natural Resources (DLNR) relating to the environmental assessment. UH and DLNR sought a protective order regarding Kilakila's discovery requests, arguing that judicial review under HEPA is limited to the record before UH at the time it rendered its determination that the Management Plan would not have a significant impact upon the environment. The Circuit Court of

the First Circuit (circuit court) granted the protective order without prejudice to subsequent discovery requests.

On certiorari, Kilakila argues that the circuit court erred by limiting its judicial review to the administrative record considered by UH. Kilakila also contends that the circuit court's determination that the environmental assessment for the Management Plan complied with HEPA was flawed as the environmental assessment failed to consider significant impacts of the plan and that, consequently, the court further erred in ruling that an environmental impact statement was not required.

Upon review of the issues presented, we hold that in a declaratory action brought to challenge an agency's determination that an environmental impact statement is not required, judicial review is not restricted to an administrative record. However, the circuit court in this case did not err because the parties were permitted to submit documents beyond those contained within the agency record, and the court did not foreclose further discovery requests by Kilakila.

Additionally, we conclude that the environmental assessment for the Management Plan complied with procedures under HEPA and did not fail to properly consider the Telescope Project. Because UH's conclusion that the Management Plan would not cause significant environmental impacts is not clearly erroneous, an environmental impact statement was not required.

Consequently, the circuit court did not err in granting summary judgment in favor of UH and the DLNR and in denying summary judgment to Kilakila. Accordingly, the Intermediate Court of Appeals' Judgment on Appeal is affirmed for the reasons stated herein.

## II. Background

### A. Management Plan

The Hawaiʻi Administrative Rules (HAR) in this case required approval of a management plan for the Observatory Site in order to construct the Telescope Project within the conservation district on Haleakalā.[3] See HAR § 13-5-22, -24, -25 (effective 1994-2010).[4] The required contents of the management plan included (1) a description of the proposed land use in general terms; (2) a description of how the proposed land use is consistent with the purpose of the conservation district and the property's subzone; (3) a location map; (4) a discussion of

---

[3] Under the 1994 version of the HAR, which were in effect at the relevant time period in this case, a "management plan" was defined as "a comprehensive plan for carrying out multiple land uses." HAR § 13-5-2 (effective 1994-2010).

[4] HAR § 13-5-22(b) provided that "[i]dentified land uses beginning with the letter (D) require a board permit, and where indicated, a management plan." HAR § 13-5-22(b)(4). HAR § 13-5-24 set forth permitted land uses in a resource subzone, including "[a]stronomy facilities under an approved management plan." HAR § 13-5-24. HAR § 13-5-25 extended the permitted uses of resource subzones to the general subzone, unless otherwise noted. HAR § 13-5-25(a).

existing conditions on the parcel;[5] (5) the proposed land use and its relationship to other existing and proposed land uses; (6) a site plan showing the location of all existing and proposed land uses; (7) the expected timing of the project; (8) monitoring strategies; (9) an environmental assessment; (10) steps to ensure that historic preservation concerns were met; and (11) a reporting schedule. HAR Chapter 13-5, Exhibit 3 (Sept. 6, 1994).[6]

UH issued its Management Plan for the Observatory Site in March 2010, replacing the Long Range Development Plan (Long Range Plan) that had been implemented in 2005 to manage the Observatory Site. The Management Plan retained many of the management strategies and guidelines, as well as the overall objectives, set forth in the Long Range Plan. To fulfill the objectives of the Management Plan and Long Range Plan, both contain specific guidelines and strategies that apply to astronomical facilities within the Observatory Site. For example, under both the Management Plan and Long Range Plan, the

---

[5]  The management plan was required to address, inter alia, ownership, resources (e.g. biological, archaeological, geological), the presence of threatened or endangered species, constraints (e.g. flood plain, tsunami, volcanic, topography), existing land uses, existing conservation district use permits, access, and soils. HAR Chapter 13-5, Exhibit 3 (Sept. 6, 1994).

[6]  The amended rules for the required contents of a management plan, effective August 12, 2011, deleted reference to an environmental assessment. HAR Chapter 13-5, Exhibit 3 (Aug. 12, 2011).

overall objective for managing the astronomical facilities in the Observatory Site is to create a structure for sustainable, focused management of the resources and operations of the Observatory Site in order to (1) protect historic, cultural, and natural resources within the site area; (2) protect and enhance education and research in the site area; and (3) provide the opportunity for future expansion of the scope of activities at the Observatory Site, where appropriate.

An environmental assessment of the Management Plan was then prepared to evaluate potential environmental impacts from implementing the Management Plan. As discussed below, UH's review of the environmental assessment was governed by HEPA and the applicable administrative rules.

### B. Hawai'i Environmental Policy Act

The Hawai'i Environmental Policy Act of 1974 (HEPA), Chapter 343 of the Hawai'i Revised Statutes (HRS), establishes "a system of environmental review which will ensure that environmental concerns are given appropriate consideration in decision making along with economic and technical considerations." HRS § 343-1 (1993). HEPA is intended to "integrate the review of environmental concerns with existing planning processes" and to "alert decision makers to significant environmental effects which may result from the implementation of certain actions." Id. As with the National Environmental

Policy Act of 1969 (NEPA),[7] HEPA serves primarily as a procedural framework under which an agency may evaluate and consider the environmental, social, and economic factors of a proposed action prior to taking action.  See Sierra Club v. Dep't of Transp., 115 Hawaiʻi 299, 306, 167 P.3d 292, 299 (2007).  Through the HEPA review process, "environmental consciousness is enhanced, cooperation and coordination are encouraged, and public participation during the review process benefits all parties involved and society as a whole."  HRS § 343-1.

HEPA's basic framework entails several review stages by the proposing or accepting agency, each of which may require additional assessment procedures.  Sierra Club, 115 Hawaiʻi at 306, 167 P.3d at 299.  First, a determination must be made as to whether a project or an action is subject to the environmental review process under HEPA.  Id.  An action or project is subject to HEPA if (1) it is initiated by a government agency or by a private entity and requires government approvals for the project or action to proceed and (2) it proposes one or more of nine enumerated land uses or administrative acts set forth in HRS Chapter 343.  Id.  These land uses or administrative acts include those that propose (1) the use of State or county lands

_____

[7]      HEPA was patterned after the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 et seq. (2015).  See Sierra Club v. Dep't of Transp., 115 Hawaiʻi 299, 306, 167 P.3d 292, 299 (2007).

or funds or (2) any use within a conservation district.
HRS § 343-5(a)(1), (2) (Supp. 2009).

If an action is subject to environmental review under HRS § 343-5(a) and is not declared exempt, the applicant of the proposed project or action must develop a draft environmental assessment. Sierra Club, 115 Hawai'i at 307, 167 P.3d at 300. An environmental assessment is "an informational document prepared by either the agency proposing an action or a private applicant, which is used to evaluate the possible environmental effects of a proposed action." Id. An environmental assessment must include the following: (1) a detailed description of the proposed action or project; (2) an evaluation of the direct, indirect, and cumulative impacts; (3) a discussion of alternatives to the proposed project or action; and (4) a description of any measures proposed to minimize potential impacts. See id.; see also HRS § 343-2 (1993). Upon completion of a draft environmental assessment, a thirty-day period begins for review and comment by the public. See Sierra Club, 115 Hawai'i at 308, 167 P.3d at 301.

After this review period, the applicant responds to public comments and finalizes the draft environmental assessment. See id. At this point, the agency proposing or approving the action reviews the final environmental assessment to determine whether the proposed action could have a

significant impact on the environment.[8]  HRS § 343-2; HAR § 11-200-2 (1996); see also Sierra Club, 115 Hawai'i at 308, 167 P.3d at 301.  A "significant impact" is defined as follows:

> the sum of effects on the quality of the environment, including actions that irrevocably commit a natural resource, curtail the range of beneficial uses of the environment, are contrary to the state's environmental policies or long-term environmental goals and guidelines as established by law, or adversely affect the economic or social welfare, or are otherwise set forth in section 11-200-12 of this chapter.

HAR § 11-200-2.  Generally, ecological, aesthetic, historic, cultural, economic, social, or health "effects" are considered. Id.  "Effects" may also include those "resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial."  Id.  In evaluating the impacts of a proposed action, consideration must be given to "every phase of a proposed action, the expected consequences, both primary and secondary, and the cumulative as well as the short-term and long-term effects of the action."[9]  HAR § 11-200-12(b) (1996). Additionally, the agency must consider thirteen instances where an action shall be determined, "in most instances," to have a significant impact on the environment.  HAR § 11-200-12(b).

---

[8]   The terms "impacts" and "effects" are synonymous and are used interchangeably throughout HEPA.  HAR § 11-200-2 (1996).

[9]   Under the HAR, the terms "primary impact" and "direct impact" are interchangeable.  HAR § 11-200-2.  "Secondary impact" and "indirect impact" are also interchangeable.  Id.

Upon completion of the final environmental assessment, if the reviewing agency determines that the proposed action is likely to cause a significant impact on the environment, an environmental impact statement must be prepared. Price v. Obayashi Haw. Corp., 81 Hawai'i 171, 180, 914 P.2d 1364, 1373 (1996). Alternatively, if the reviewing agency determines that the proposed action will not result in a significant environmental impact, then the agency must issue and publish a finding of no significant impact (i.e., a negative declaration) in the Office of Environmental Quality Control's bulletin prior to implementing or approving the action. See HRS § 343-2 (defining a "finding of no significant impact" as "a determination that the subject action will not have a significant effect and, therefore, will not require the preparation of an environmental impact statement"); HAR § 11-200-2 (stating that a "negative declaration is required prior to implementing or approving the action"). Publication of a negative declaration initiates a thirty-day period during which that determination may be challenged through litigation.[10] See HRS § 343-7(b) (1993).

---

[10] Under HEPA, an aggrieved party may bring a legal challenge at three distinct phases of environmental review: "(1) when no [environmental assessment] is prepared, (2) when an agency determines that an environmental impact statement will or will not be required, and (3) when an [environmental impact statement] is accepted." Sierra Club, 115 Hawai'i at 308, 167 P.3d at 301; see HRS § 343-7.

### C. Environmental Assessment of the Management Plan

An environmental assessment of the Management Plan was prepared as required by HEPA.[11]  On March 1, 2010, UH issued a draft environmental assessment and solicited public comment.  On October 22, 2010, UH sent a letter to the Office of Environmental Quality Control, stating that it found the Management Plan would have no significant environmental impact.  Thereafter, on October 25, 2010, UH issued its final environmental assessment (EA).

The executive summary of the EA stated that "the purpose of the environmental assessment was to inform the relevant state agencies and the public of the likely environmental consequences of the [Management Plan] on ongoing and future actions at [the Observatory Site] in support of astronomical research."  The EA evaluated the environmental effects that might occur as a result of implementing the Management Plan's site management strategies and guidelines.[12]  The EA considered proposed practices at the site area that

---

[11]    The parties debated whether an environmental assessment was required for the Management Plan or whether it was exempt from HEPA as a planning document under HRS § 343-5(b).  The final environmental assessment states that it was "trigger[ed]" under HEPA because it involved the use of State funds and the use of conservation district lands.

[12]    The Management Plan generally included monitoring and management strategies for (1) astronomical and space surveillance experiments, (2) requirements for new facility design, construction, and operation, and (3) the replacement of Observatory Site facilities in support of long-term science investigation.

included the following: weeding of the Observatory Site; vector control for rodents; soil and erosion control to maintain habitat ecosystems; nighttime lighting restrictions to prevent misdirecting 'ua'u; and frequent removal of trash to prevent predators from obtaining food sources. Additional strategies set forth in the Management Plan for managing environmental resources were evaluated, including practices for reducing dust and emissions if construction equipment is used and prohibitions on the importation of fill material, unless sterilized. The EA also reviewed the Management Plan's strategies related to cultural resources, such as placing a sign welcoming Native Hawaiians to practice traditional cultural practices within the Observatory Site; mandating cultural training for all personnel working within the Observatory Site; and engaging a cultural specialist for any construction requiring a permit from DLNR.

The EA was limited to evaluating the Management Plan for activities that would be undertaken at the Observatory Site "in support of ongoing and future astronomical research activities."[13] The EA expressly indicated that its evaluation of the Management Plan was not intended to assess impacts from the construction or operation of any new project at the Observatory

---

[13] The EA provided a comparative summary of the potential impacts for both the implementation of the Management Plan and the no-action alternative of not implementing the Management Plan.

Site or to authorize any construction at the Observatory Site.[14]

Rather, the EA stated that a separate evaluation for potential

impacts to resources within the Observatory Site was required

for any new proposed project within the site area. The EA also

noted that the relevant State agencies and the public would be

informed of the environmental consequences of any new proposed

project within the Observatory Site.

The EA concluded that implementing the Management Plan

would result in no impact to "land use and existing activities,

topography, geology and soils, infrastructure and utilities,

climatology and air quality, and socioeconomics." However, the

EA noted that the presence of facilities and ongoing operations

at the Observatory Site would impact cultural resources. The EA

stated that some believe any man-made structures or activities

in the site area would have adverse impacts on the sacredness of

the summit area at Haleakalā. Considering this view and others,

the EA concluded that, while some Native Hawaiians would not

consider the Management Plan as beneficial, the impact of

implementing the Management Plan on cultural and historic

---

[14]    The EA explained that "future actions, which are not the subject of this [Management Plan], may include developing" (1) facilities and experiments dedicated to searching for and characterizing planets around the sun and other stars; (2) facilities and experiments devoted to the study of oscillations and stellar activity in other stars; and (3) experiments that study the sun and its outer atmosphere.

resources would be less than significant.[15]  The EA found that while the Management Plan's practices and procedures were intended to be helpful and to reduce adverse impacts from the routine management of the Observatory Site, the cumulative impact of the Management Plan, along with past and ongoing actions, would still be adverse to cultural and historic resources but less than significant.  That is, the Management Plan would "not substantially contribute to the adverse impacts from past, present, and reasonably foreseeable future activities on cultural resources" and would "not combine with any other actions to produce incrementally different impacts on historic or archeological resources."

Although the EA stated that the Management Plan would have no significant impact, the EA also concluded that future projects at the Observatory Site could result in significant impacts.  For example, the EA found that future projects may have adverse impacts on the stormwater and drainage system, the roadways and traffic, noise levels and the visual character of the site area, even though the Management Plan would result in some beneficial impacts on these resources.  Additionally, the

---

[15]     The EA noted that the current ambient noise level within the Observatory Site is low but observed that "cultural practitioners within the immediate vicinity of a noise source could be disturbed."  However, the EA stated that most noise disturbances are "low level discrete events" and thus the current noise levels are compatible with existing activities.

EA noted that "there was overwhelming evidence, from a cultural and traditional standpoint, that construction of a large, visible structure at [the Observatory Site] would result in a significant impact on some Native Hawaiian traditional cultural practices and beliefs." The EA thus observed that the construction of new facilities affecting cultural resources would be individually analyzed with separate environmental documentation completed for each new project.

Based on the EA's analysis, UH determined that implementing the Management Plan would "either have beneficial, less than significant, or no impacts" at the Observatory Site. In light of its determination that the Management Plan would have no significant environmental impact, UH did not prepare an environmental impact statement.

On November 22, 2010, BLNR held a hearing concerning the Management Plan and a conservation district use application for the Telescope Project.[16] On December 1, 2010, BLNR held a second hearing, in which both the Management Plan and the conservation district use application were "taken together" but

---

[16]    In addition to an approved management plan, approval of the Telescope Project within the conservation district required a conservation district use permit. Kilakila is challenging BLNR's issuance of the permit for the Telescope Project in a separate case before this court.

    According to the minutes from the hearing, a DLNR employee stated that "[s]taff is here to see the Board's approval of the Management Plan. We will then discuss the proposed [Telescope] Project which will be the first telescope approved under the Management Plan that the Board is considering."

"voted [upon] separately."  At this hearing, BLNR approved the Management Plan with one amendment requiring a report in five years.

### D. Court Proceedings

On November 22, 2010, prior to BLNR's approval of the Management Plan, Kilakila filed a complaint in the circuit court seeking declaratory and injunctive relief against UH,[17] BLNR, and DLNR.[18]  The complaint sought to "ensure the preparation of an [environmental impact statement] for the [Management Plan]," contending that UH improperly concluded that the Management Plan would have no significant impact and thus UH's actions violated HEPA.[19]  UH and DLNR denied that the EA improperly concluded that the Management Plan would have no significant impact or that UH violated HEPA.

---

[17]    Kilakila named Virginia Hinshaw, Chancellor of UH, in her official capacity as Chancellor of UH, as a defendant.  During the pendency of this case, Thomas M. Apple succeeded Virginia Hinshaw, and Robert Bley-Vroman succeeded Thomas M. Apple as Chancellor of UH.

[18]    Laura Thielen was additionally named in her official capacity as Chair of BLNR.  She was succeeded by William Aila, who was then succeeded by Suzanne D. Case, during the pendency of this case.

[19]    Kilakila prayed for the following relevant relief: (1) a declaration that UH violated HRS Chapter 343; (2) a declaration that UH must prepare an environmental impact statement for the Management Plan; (3) a declaration that UH improperly accepted the EA for the Management Plan; (4) a declaration that the Management Plan "may have a significant impact"; (5) a declaration that "any permits granted pursuant to the EA for the [Management Plan] are null and void"; (6) a declaration that the Management Plan was null and void; and (7) a declaration that all permits granted pursuant to the Management Plan, "including the [permit] for the Telescope Project, are null and void."

### 1. Discovery Requests and Protective Order

Kilakila made a series of discovery requests to UH and DLNR attempting to authenticate documents prepared by UH and to obtain admissions from UH as to various statements that were made in the documents. Kilakila also sought "to obtain all relevant documents" and "attempted to discover the factual basis of all of [UH's] defenses." DLNR, UH, and Kilakila met and conferred in an effort to resolve the dispute over Kilakila's discovery requests. UH and DLNR maintained that the case must be decided based only on the record before UH when it made its finding of no significant impact. Kilakila was informed that UH was preparing an administrative record that would be filed in circuit court, which could be supplemented upon further agreement of the parties.

UH then moved for a protective order, pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 26(c),[20] as to "all

---

[20]    HRCP Rule 26(c) provides, in pertinent part,

> Protective Orders. Upon motion by a party or by the person from whom discovery is sought, accompanied by a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition, the court in the circuit where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . .

HRCP Rule 26.

outstanding discovery directed to [UH] by [Kilakila] and any subsequently filed requests." UH argued that its motion for protective order should be granted because the question of whether UH complied with HEPA was a question of law that required no factual determinations. UH contended that HEPA does not permit discovery beyond an administrative record and that Kilakila therefore "should not be permitted discovery into issues not before the agency at the time it made its decision." DLNR joined the motion and separately argued that Kilakila's discovery requests "seek irrelevant and intrusive information and will not lead to the discovery of admissible evidence."

After filing the motion for protective order, UH filed an Administrative Record pertaining to its review of the EA, which contained the following documents: the draft environmental assessment for the Management Plan; the published notice of the draft environmental assessment by the Office of Environmental Quality Control; a letter from Virginia Hinshaw, then-Chancellor of UH, to the Director of the Office of Environmental Quality Control, containing UH's finding of no significant impact on the environment for the Management Plan; the EA for the Management Plan; and the Notice of the EA published by the Office of Environmental Quality Control. The draft Management Plan, the final Management Plan, and a series of post-Long Range Plan

studies regarding the Observatory Site were attached as appendices to the Administrative Record.[21]

In response to the motion for protective order, Kilakila argued that it would be an abuse of discretion for the circuit court to grant a blanket ban on discovery without balancing the "need for the information against the injury that might result if uncontrolled disclosure is permitted."[22] Kilakila contended that the circuit court's review should not be limited to the Administrative Record because this case was not an HRS Chapter 91 contested case appeal.

In its reply, UH asserted that the Administrative Record contained all of the information that UH had considered in making its determination under HRS Chapter 343 and the relevant HAR. UH further contended that discovery was not necessary because Kilakila already had in its possession the documents sought as Kilakila had attached those documents to its response to the motion for protective order. After a hearing, the circuit court granted UH's motion for protective order

---

[21] A number of studies were conducted at the Observatory Site, including an archeological recovery plan, a stormwater management plan, a 2007 supplemental anthropod inventory and a 2009 anthropod study, a supplemental cultural impact assessment, and a botanical survey.

[22] Attached to Kilakila's response were selected portions of the environmental impact statement for the Telescope Project.

(Protective Order) "without prejudice to any future discovery requests" by Kilakila.

## 2. Motions for Summary Judgment

Each of the parties then filed a motion for summary judgment (MSJ).[23] In its MSJ, Kilakila contended that HEPA's implementing rules identify three types of impacts on the environment--direct, secondary, and cumulative--and that each must be assessed to ensure that all possible impacts of a project are considered. Kilakila argued that by failing to consider the Telescope Project as a direct, secondary, and cumulative impact of the Management Plan, the EA ignored significant impacts and improperly segmented the required analysis under HEPA. Kilakila concluded that the circuit court should grant its MSJ because the Management Plan would likely have a significant impact on the environment and, consequently, required the preparation of an environmental impact statement.

In its MSJ,[24] UH argued that it had followed the proper procedures under HEPA and that the EA provided sufficient

_____

[23] The parties attached exhibits to their respective MSJ, responses, or replies that went beyond the Administrative Record. For example, UH attached the Long Range Plan to its reply. For its MSJ, Kilakila attached, inter alia, the Telescope Project's environmental impact statement and declarations from two individuals. Kilakila also attached to its memorandum in opposition to UH's MSJ, inter alia, a DLNR Staff Submittal on the Telescope Project and minutes of two BLNR meetings.

[24] In its MSJ, DLNR substantively joined UH's MSJ. DLNR additionally argued that an environmental assessment was not required because the Management Plan was a planning document and that DLNR was not a necessary
(continued. . .)

21

information to permit informed decision-making. UH also asserted that the Telescope Project was not a direct or secondary impact of the Management Plan and maintained that the EA properly considered the cumulative impacts of the Management Plan's implementation--that is, the incremental impact of the Management Plan when added to other past, present, and reasonably foreseeable actions. UH contended that the incremental impact of the Management Plan would be less than significant and, on the whole, beneficial to the environment.

After a hearing on the parties' MSJs, the circuit court granted UH's MSJ and DLNR's MSJ and denied Kilakila's MSJ (MSJ Order).[25] In the MSJ Order, the circuit court found that the Management Plan is a guideline and planning tool that sets forth certain policies and monitoring strategies applicable to future actions. The circuit court determined that the Management Plan does not authorize specific projects, such as the Telescope Project, and that future projects would require their own environmental review. The circuit court concluded that, under the rule of reason standard set forth in Hawaiʻi case law, the EA for the Management Plan complied with HRS Chapter

---

(. . .continued)
or proper party to the litigation. These arguments are not presented in DLNR's response to the application for writ of certiorari, and thus they are not addressed.

[25] The Honorable Rhonda Nishimura presided.

343 and that preparation of an environmental impact statement was not required.  The circuit court entered final judgment.  Kilakila timely appealed, arguing that the circuit court erred in granting the Protective Order and erred in granting UH's and DLNR's respective MSJs while denying Kilakila's MSJ.

### 3. ICA Opinion

The ICA, in a published opinion, held that the circuit court did not err by concluding that the EA complied with HRS Chapter 343 and that an environmental impact statement was not required.  Kilakila ʻO Haleakalā v. Univ. of Haw., 134 Hawaiʻi 86, 94-98, 332 P.3d 688, 696-700 (App. 2014).  The ICA also held that the circuit court did not abuse its discretion in granting the Protective Order because "[w]hether the Management Plan's EA and its Negative Declaration complied with HRS Chapter 343 is a question of law that does not require factual determinations beyond the administrative record."  Id. at 98-99, 332 P.3d at 700-01.  Accordingly, the ICA affirmed the circuit court's Protective Order, MSJ Order, and final judgment.  Id. at 99, 332 P.3d at 701.

### III.    Standards of Review

### A. Motion for Summary Judgment

Hawaiʻi appellate courts review an award of summary judgment de novo under the same standard applied by the circuit

court.  Thomas v. Kidani, 126 Hawai'i 125, 127-28, 267 P.3d 1230,

1232-33 (2011).  That standard has been articulated as follows:

> Summary judgment is appropriate if the pleadings,
> depositions, answers to interrogatories, and admissions on
> file, together with the affidavits, if any, show that there
> is no genuine issue as to any material fact and that the
> moving party is entitled to judgment as a matter of law.

Kepoo v. Kane, 106 Hawai'i 270, 287, 103 P.3d 939, 956 (2005)

(quoting Beamer v. Nishiki, 66 Haw. 572, 577, 670 P.2d 1264,

1270 (1983)).  "A fact is material if proof of that fact would

have the effect of establishing or refuting one of the essential

elements of a cause of action or defense asserted by the

parties."  Fujimoto v. Au, 95 Hawai'i 116, 136, 19 P.3d 699, 719

(2001) (quoting Hulsman v. Hemmeter Dev. Corp., 65 Haw. 58, 61,

647 P.2d 713, 716 (1982)).  The moving party bears the burden of

demonstrating that there is no genuine issue as to any material

fact with respect to the essential elements of the claim or

defense and must prove that the moving party is entitled to

judgment as a matter of law.  French v. Haw. Pizza Hut, Inc.,

105 Hawai'i 462, 470, 99 P.3d 1046, 1054 (2004).  This court must

review the evidence and inferences in the light most favorable

to the non-moving party.  Thomas, 126 Hawai'i at 128, 267 P.3d at

1233.

In cases of public importance, a circuit court should

grant a motion for summary judgment "sparingly, and never on

limited and indefinite factual foundations."  Molokai

24

Homesteaders Coop. Ass'n v. Cobb, 63 Haw. 453, 458, 629 P.2d 1134, 1139 (1981). However, if there is no genuine issue as to any material fact and the moving party clearly demonstrates that they should prevail as a matter of law, then summary judgment is proper. Id.

### B. Review Under HEPA

For agency determinations under HEPA, "the appropriate standard of review depends on the specific question under consideration." Sierra Club v. Dep't of Transp., 115 Hawaiʻi 299, 315, 167 P.3d 292, 308 (2007). Generally, a court reviews agency determinations that involve factual questions under a clearly erroneous standard. Id. at 315, 167 P.3d at 308; see also Del Monte Fresh Produce (Haw.), Inc. v. Int'l Longshore and Warehouse Union, 112 Hawaiʻi 489, 499, 146 P.3d 1066, 1076 (2006) ("[An agency's] conclusion of law that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case."). However, "[w]hether or not an agency has followed proper procedures or considered the appropriate factors in making its determination is a question of law, and will be reviewed de novo." Sierra Club, 115 Hawaiʻi at 315, 167 P.3d at 308.

## IV.     Discussion

In its application for writ of certiorari, Kilakila appeals the ICA's affirmance of the MSJ Order, arguing that the ICA opinion is flawed because judicial review is not confined to an administrative record in cases of this nature.  Kilakila additionally contends that (1) the ICA erred in concluding that UH complied with HEPA and HAR § 11-200-12 when UH made its negative declaration for the EA and (2) UH's conclusion that the Management Plan would not have a significant environmental impact is clearly erroneous.  Kilakila specifically argues that because the Telescope Project would have a significant impact and is a component, secondary, and cumulative impact of the Management Plan, UH is required to prepare an environmental impact statement for the Management Plan.

### A. Scope of Judicial Review under HEPA

The ICA held that the circuit court did not abuse its discretion in granting the Protective Order because whether the EA complied with HRS Chapter 343 was a question of law that did not require review beyond the Administrative Record.  Kilakila, 134 Hawai'i at 98-99, 332 P.3d at 700-01.  Kilakila argues that the ICA's opinion is flawed because an administrative record does not exist in cases of this nature and there is nothing in HEPA, the Hawai'i Rules of Civil Procedure, or the Rules of Circuit Court that prohibits presenting evidence related to a

26

motion for summary judgment.  Kilakila contends that confining review to an administrative record "sets a dangerous precedent" for future litigation under HEPA and that restricting judicial review to the administrative record limited the ICA's analysis by allowing the court "to ignore the significant impacts" disclosed in the Telescope Project's environmental impact statement.

Kilakila brought this case as a declaratory action under HRS § 632-1 (1993)[26] and HRS § 343-7(b) (1993).  Under HRS § 343-7(b), "[a]ny judicial proceeding, the subject of which is the determination that a[n] [environmental impact] statement is not required for a proposed action, shall be initiated within thirty days after the public has been informed of such determination pursuant to section 343-3."  HRS § 343-7(b).  The term "administrative record" or its equivalent does not appear

---

[26]     HRS § 632-1 provides, in part,

> Relief by declaratory judgment may be granted in civil cases where an actual controversy exists between contending parties, or where the court is satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation, or where in any such case the court is satisfied that a party asserts a legal relation, status, right, or privilege in which the party has a concrete interest and that there is a challenge or denial of the asserted relation, status, right, or privilege by an adversary party who also has or asserts a concrete interest therein, and the court is satisfied also that a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding.

HRS § 632-1.

anywhere in HRS § 632-1 (declaratory judgment action), HRS Chapter 343 (HEPA), or HAR § 11-200-1 et seq. (HEPA's implementing administrative rules).  That is, none of these statutes or rules prescribes limitations as to the extent of discovery that is permitted in a declaratory judgment action brought pursuant to HEPA or restricts a court's consideration of the issues to an administrative record.[27]

By contrast, judicial review of an appeal from a contested case proceeding brought pursuant to HRS § 91-14 (Supp. 2004) "shall be confined to the record."  HRS § 91-14(f).[28]  The record for a contested case appeal, prepared by the agency, must include the following: (1) all pleadings, motions, and intermediate rulings; (2) evidence received or considered, including oral testimony, exhibits, and a statement of matters officially noticed; (3) offers of proof and rulings thereon; (4) proposed findings and exceptions; (5) report of the officer who presided at the hearing; and (6) staff memoranda submitted to members of the agency in connection with their consideration of

---

[27]    The only express restriction on an action brought under HEPA is that in a judicial action brought to challenge the acceptance of an environmental impact statement, the "contestable issues" are "limited to issues identified and discussed in the written comment" during the "designated review period."  HRS § 343-7(c).

[28]    The two exceptions to this requirement are in cases where a trial de novo, including a trial by jury, is provided by law and in cases where the record does not reflect alleged procedural irregularities before the agency; in these situations, the court is authorized to receive testimony.  HRS § 91-14(f).

the case. HRS § 91-9(e) (Supp. 2003). Thus, a circuit court reviewing a contested case may not consider matters beyond the administrative record because it acts as an appellate court, not as a trial court considering a declaratory judgment action.[29] See HRS § 91-14(g) (indicating that a circuit court reviewing a contested case may affirm, remand, reverse, or modify the decision and order of the agency); cf. Dep't of Envtl. Servs. v. Land Use Comm'n, 127 Hawai'i 5, 12, 275 P.3d 809, 816 (2012) (noting that this court's standard of review for "a decision made by the circuit court upon its review of an agency's decision is a secondary appeal" in which this court "must determine whether the circuit court was right or wrong in its decision [by] applying the standards set forth in HRS § 91-14(g) . . . to the agency's decision" (quoting Save Diamond Head Waters LLC v. Hans Hedemann Surf, Inc., 121 Hawai'i 16, 24, 211 P.3d 74, 82 (2009))).

In contrast, a declaratory judgment action is an action before the circuit court that affords the court "plenary" authority and does not limit the scope of review vested in the court. See Punohu v. Sunn, 66 Haw. 485, 487, 666 P.2d 1133, 1135 (1983) ("Since the scope of review vested in the circuit

_____

[29] The limited exception to this principle is stated supra in note 27.

court in an appeal pursuant to § 91-14, HRS, is much more limited than the court's plenary authority in an original action commenced before it, it would be anomalous to permit a declaratory judgment action to be substituted for an appeal from an agency determination in a contested case."); see also Hawaii's Thousand Friends v. City and Cty. of Honolulu, 75 Haw. 237, 248, 858 P.2d 726, 732 (1993) (stating that although an agency's decision "carries a presumption of validity in a generic agency appeal" under HRS § 91-14, the circuit court "was not required to defer" to the agency's determination on the potential environmental impact of a project when considering a petition for declaratory judgment under HRS § 632-1 and could "make its own independent findings regarding the salient facts" of the case).

This court has indicated that a reviewing court considering a declaratory judgment action under HEPA is not limited to an administrative record. Unite Here! Local 5 v. City and Cty. of Honolulu, 123 Hawai'i 150, 231 P.3d 423 (2010), which arose from the proposed expansion of a hotel resort for which an 1985 environmental impact statement (EIS) had been completed and accepted, considered whether the resort's subdivision application twenty years later triggered the need for a supplemental EIS. Id. at 154, 231 P.3d at 427. In reviewing whether a supplemental EIS should have been required,

30

this court considered post-1985 EIS reports and studies regarding traffic conditions, monk seals, and green sea turtles that were not part of the agency record but were submitted to the circuit court by the plaintiffs. Id. at 179, 231 P.3d at 452. Based on these extra-record reports and studies, which constituted "new" evidence that was not originally disclosed and not previously considered by the reviewing agency, this court determined that a supplemental EIS should have been prepared and reviewed. Id. Unite Here! indicated that its consideration of these extra-record documents was consistent with the public purpose underlying HEPA, which was to "ensure that environmental concerns are given appropriate consideration in decision making." Id. at 180, 231 P.3d at 453.

Several federal courts have adopted a similar approach in allowing judicial review beyond the administrative record for actions arising under NEPA, the federal counterpart to HEPA. See Sierra Club v. Peterson, 185 F.3d 349, 370 (5th Cir. 1999) (setting forth the requirements and purpose of NEPA as justification for allowing judicial review of extra-record evidence in NEPA cases); Sierra Club v. Hassell, 636 F.2d 1095, 1097-98 (5th Cir. 1981) (stating that a reviewing court must review the administrative records as well as other evidence to determine whether an agency adequately considered NEPA's values and the proposed project's potential environmental effects

before reaching a decision on whether an environmental impact statement was necessary); <u>Gulf Coast Rod Reel & Gun Club, Inc. v. U.S. Army Corps of Eng'rs</u>, No. 3:13:-CV-126, 2015 WL 1883522, at *2 (S.D. Tex. Apr. 20, 2015) (indicating that allowing judicial review beyond the administrative record is based on the underlying requirements and purpose of NEPA, which calls for a comparative inquiry).

The Fifth Circuit Court of Appeals has concluded that consideration by the reviewing court of evidence beyond the administrative record may be necessary to ensure that the record available to the agency enabled a full discussion of the environmental effects and alternatives.

> To limit the judicial inquiry regarding the completeness of the agency record to that record would, in some circumstances, make judicial review meaningless and eviscerate the very purposes of NEPA. The omission of technical scientific information is often not obvious from the record itself, and a court may therefore need a plaintiff's aid in calling such omissions to its attention. Thus, we have held that the consideration of extra-record evidence may be appropriate in the NEPA context to enable a reviewing court to determine that the information available to the decisionmaker included a complete discussion of environmental effects and alternatives.

<u>Peterson</u>, 185 F.3d at 370 (quoting <u>Nat'l Audubon Soc'y v. Hoffman</u>, 132 F.3d 7, 14-15 (2d Cir. 1997)). Another federal court similarly noted that "[d]eciding whether an agency has sufficiently considered environmental impacts requires some sense of the universe of information that was available for the agency to consider," which often necessitates consideration of

other evidence, apart from the agency record, to ensure effective judicial review. Gulf Coast Rod Reel & Gun Club, Inc., 2015 WL 1883522, at *2; see also Davis Mountains Trans-Pecos Heritage Ass'n v. Fed. Aviation Admin., 116 F. App'x 3, 12 (5th Cir. 2004) (noting that a reviewing court is not limited to the agency record "where examination of extra-record materials is necessary to determine whether an agency has adequately considered environmental impacts under NEPA").

Accordingly, in a declaratory action brought to challenge an agency's determination that an environmental impact statement is not required, a reviewing court may consider other evidence in addition to the agency record to determine whether the agency decision-maker adequately considered the potential environmental effects and alternatives for a particular project or action.

We note that the record in this case indicates that the parties were not restricted from attaching extra-record evidence to their pleadings and, in fact, submitted exhibits that went beyond the Administrative Record. Additionally, in issuing the Protective Order, the circuit court did so "without prejudice to future discovery requests," and, consequently, the Protective Order did not bar Kilakila from filing additional

discovery requests.[30]  Further, the circuit court did not restrict its review of the parties' MSJs to the Administrative Record.  The circuit court based its ruling on the parties' MSJs and "the files and records herein" which, as noted, included numerous documents submitted by the parties that were not part of the Administrative Record.  Accordingly, judicial review was not restricted to the Administrative Record in this case.

## B. Sufficiency of the Environmental Assessment

Kilakila maintains that the ICA erred in affirming the circuit court's MSJ Order because UH did not comply with the procedures under HEPA and UH's negative declaration is clearly erroneous.  Kilakila contends that the EA failed to consider the Telescope Project as a component of the Management Plan and as a secondary and cumulative impact of the Management Plan. Kilakila also argues that the Administrative Record and other evidence submitted to the circuit court by the parties raised a genuine issue as to material facts that precluded the grant of summary judgment in favor of UH and DLNR.

## 1. Single Action "Component" Analysis

As stated, Kilakila contends that the EA was deficient because it failed to consider the effects of the Telescope Project as a component of the Management Plan.  Kilakila's

---

[30]    Kilakila did not challenge the issuance of the Protective Order in its application for writ of certiorari.

contention appears to be that the Telescope Project is a component of the Management Plan and therefore the two actions constitute a single action under HAR § 11-200-7 (1996).[31]  A group of discrete actions may require a collective environmental assessment if the actions satisfy one of the four elements of the single action test set forth in HAR § 11-200-7.  Two or more actions are to be treated as a single action if the component actions "are phases or increments of a larger total undertaking."  HAR § 11-200-7(1).  Thus, if the effects of the Telescope Project and Management Plan must be considered together as a single action, then they cannot be improperly segmented into separate environmental reviews, as this would

---

[31]     The single action test provides that a group of actions proposed by an agency or applicant are to be treated as a single action when any of the following apply:

> (1)   The component actions are phases or increments of a larger total undertaking;
>
> (2)   An individual project is a necessary precedent for a larger project;
>
> (3)   An individual project represents a commitment to a larger project; or
>
> (4)   The actions in question are essentially identical and a single statement will adequately address the impacts of each individual action and those of the group of actions as a whole.

HAR § 11-200-7.  Although Kilakila did not cite to HAR § 11-200-7 in its arguments before this court, Kilakila argued in its application for writ of certiorari that the Telescope Project is a component of the Management Plan. The other three statutory subsections providing for a group of actions to be treated as a "single action" were not asserted by Kilakila.

35

evade the preparation of an environmental impact statement for the single action. See id.

In Kahana Sunset Owners Association v. County of Maui, 86 Hawai'i 66, 74, 947 P.2d 378, 386 (1997), this court applied HAR § 11-200-7(1) to determine whether, for purposes of environmental review under HEPA, a proposed drainage system and a proposed residential development constituted a single action and thus required a single environmental assessment. We held that the proposed development and drainage system constituted a single action under HAR § 11-200-7(1) because "[t]he proposed drainage system is part of the larger [residential development] project." Id. The court explained that the drainage system would have no "independent utility" and would not be constructed without the residential development. Id. Consequently, the drainage system and housing development were a "single action" under HAR § 11-200-7, and a single environmental assessment was required to evaluate the entire proposed development, i.e., the combined impacts of both the drainage system and housing development. Id.

In accordance with Kahana Sunset, in determining whether a project is a "component" of another project and thus a single action for the purposes of environmental review under HEPA, consideration must be given as to whether the proposed

action has independent utility from the other project.[32]  See id.

Here, it is clear from the record that the Management Plan has

independent utility from the Telescope Project.  As discussed

above, the strategies and guidelines within the Management Plan

apply to the entire Observatory Site, which includes numerous

existing astronomical facilities.  Additionally, many of the

strategies and guidelines within the Management Plan have been

previously implemented by the previous Long Range Plan,

indicating that the strategies have utility separate and

independent from the Telescope Project.  Further, the management

and monitoring strategies within the Management Plan apply to

future development within the Observatory Site, including, but

not limited to, the Telescope Project.

Because the Management Plan's strategies and

guidelines apply to the entire Observatory Site and may be

implemented regardless of whether the Telescope Project is

constructed, the Management Plan has independent utility from

the Telescope Project, and, consequently, the Telescope Project

and Management Plan do not constitute a "single action" under

HAR § 11-200-7(1).

---

[32]     To determine whether multiple actions should be treated as a
single action under NEPA, federal courts have applied a similar "independent
utility" test.  See Great Basin Mine Watch v. Hankins, 456 F.3d 955, 969 (9th
Cir. 2006).  Under the "independent utility" test, "[w]hen one of the
projects might reasonably have been completed without the existence of the
other, the two projects have independent utility and are not 'connected' for
NEPA's purposes."  Id.

### 2. Secondary Impact Analysis

Kilakila further argues that the Telescope Project is a secondary impact because the Management Plan "is a necessary step in the authorization of the Telescope Project" and because it facilitates the Telescope Project. Secondary impacts are those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable," including "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." HAR § 11-200-2. In arguing that the Telescope Project is a secondary impact of the Management Plan, Kilakila relies, in part, on this court's analysis in Sierra Club v. Department of Transportation, 115 Hawai'i 299, 167 P.3d 292 (2007).

In Sierra Club, environmental groups brought a challenge against the Department of Transportation's (DOT) determination that physical improvements to a harbor to accommodate the Hawai'i Superferry were exempt from environmental review under HEPA. Id. at 306, 167 P.3d at 299. The environmental groups argued that DOT's exemption determination failed to consider the secondary effects from improving the harbor, namely, the operation of the Superferry. Id. at 336, 167 P.3d at 329. This court found that DOT did not consider the

38

secondary effects that may occur from operating the Superferry, which were incident to and a consequence of the harbor improvements. Id. at 341-42, 167 P.3d at 334-35. The court noted that the harbor improvements were "necessary to accommodate the Superferry project, including the construction of a removable barge . . . and other improvements to assist in Superferry operations." Id. at 305, 167 P.3d at 298. Accordingly, the court held that DOT failed to comply with HEPA because the record showed that DOT did "not consider whether its facilitation of the Hawaii Superferry Project will probably have minimal or no significant impacts, both primary and secondary, on the environment." Id. at 342, 167 P.3d at 335.

In this case, in contrast to Sierra Club, where improvements to the harbor were "necessary to accommodate the Superferry project" and "to assist in Superferry operations," implementing the Management Plan imposes restrictions and conditions on existing operations and future development within the Observatory Site, including the Telescope Project. For example, implementation of the Management Plan imposes nighttime lighting restrictions within the Observatory Site and prohibits any fill material at the site unless sterilized in order to prevent the importation of non-native species. The implementation of such strategies and requirements do not

facilitate,[33] or make easier, the Telescope Project; rather, they impose conditions and restrictions on the construction and operation of any present and future operations at the Observatory Site.

Additionally, as noted, the Management Plan has independent utility by providing guidelines and monitoring strategies that universally apply to all ongoing and future actions within the Observatory Site as long as the Management Plan is in effect. Implementing such guidelines and strategies will neither result in nor cause the construction or operation of the Telescope Project. The Management Plan is operative regardless of whether the Telescope Project is built. Thus, the fact that the Management Plan is a requirement to obtain a conservation district use permit for astronomical facilities within a conservation district does not render the Telescope Project as a secondary impact of the Management Plan.

### 3. Cumulative Impact Analysis

Kilakila's last argument turns on whether the EA properly considered the Telescope Project when evaluating the Management Plan's cumulative impact on the environment. Kilakila maintains that because the environmental impact

---

[33] As defined in Black's Law Dictionary, "facilitate" means "To make the occurrence of (something) easier; to render less difficult." Black's Law Dictionary (10th ed. 2014)

statement for the Telescope Project concluded that the Telescope Project would "result in major, adverse, short- and long-term, direct impacts" on cultural resources, and because the Telescope Project is a reasonably foreseeable future action, the cumulative impact of the Management Plan cannot be less than significant, and therefore, UH's conclusion that the Management Plan will not have a significant environmental impact is clearly erroneous.

Under HEPA, "cumulative impacts" are the incremental impacts from the proposed action: that is, the impacts from the implementation of the Management Plan when added to other past, present, and reasonably foreseeable future actions.[34]  HAR § 11-200-2.  "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."[35]  Id.  Accordingly, the EA was required to determine whether the incremental impact of implementing the Management

_____

[34]    NEPA provides a nearly identical definition of "cumulative impacts" as HEPA does.  See 40 CFR § 1508.7 (2016).

[35]    The Ninth Circuit provides the following example of individually minor, but collectively significant, impacts to the environment:

> [T]he addition of a small amount of sediment to a creek may have only a limited impact on salmon survival, or perhaps no impact at all.  But the addition of a small amount here, a small amount there, and still more at another point could add up to something with a much greater impact, until there comes a point where even a marginal increase will mean that no salmon survive.

Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt., 387 F.3d 989, 994 (9th Cir. 2004).

Plan, such as implementing soil and erosion control, nighttime lighting restrictions, and cultural training, on past, present, and reasonably foreseeable actions would have significant impacts on the environment.

Contrary to Kilakila's argument, the impact of the Telescope Project on cultural resources as determined by the environmental impact statement would not automatically render any other action within the Observatory Site to be of similar magnitude. As Kilakila does not contend that any of the strategies or guidelines within the Management Plan would themselves have a significant impact on the environment, or that they would add to the Telescope Project's impact, we address whether the EA properly considered the Telescope Project within the cumulative impact analysis of the Management Plan.

Here, the EA discussed and evaluated the cumulative impact of the Management Plan--i.e., the incremental impact of implementing the Management Plan on past, present, and reasonably foreseeable future actions, including the Telescope Project.[36] After evaluating the Management Plan's cumulative

---

[36] The Telescope Project was just one of fifteen "Past, Present, and Reasonably Foreseeable Future Actions Subject to the Observatory Site Management Plan" that were evaluated and discussed by the EA. The EA also considered the following past, present, and reasonably foreseeable actions subject to the Management Plan: Mees Solar Observatory; Atmospheric Airglow; Zodiacal Light; Cosmic Ray Neutron Monitor Station; Baker-Nunn Site; Faulkes Telescope Facility; Pan-STARRS, PS-1 South; PS-2 North, 2nd facility; Maui Space Surveillance Complex; SLR-2000; Haleakalā Visitor Center Comfort Station; FAA site adjacent to Observatory Site, Homeland Security Tower;

(continued. . .)

impact, the EA concluded that the Management Plan's cumulative impact would be beneficial, less than significant, or result in no impact to the following resources: land use; cultural, historic, and archeological resources; biological resources; topography, geology, and soils; visual resources and view plain; hydrology; infrastructure and utilities, including storm water drainage systems and traffic; air quality; public health, including hazardous materials and noise; socioeconomics; and natural hazards.

For example, considering the incremental impact of the Management Plan on land use resources, the EA concluded that while "construction of the proposed [Telescope Project] would increase the level of existing telescope activities" within the Observatory Site, the "combined impacts of implementing the [Management Plan] with all past, present, and reasonably foreseeable future actions would be less than significant." The EA found that the impact on visual resources from implementing the Management Plan would be beneficial, and less than significant, because the Management Plan is intended to minimize the impacts from other actions that may themselves have adverse

_____

(. . .continued)
Advanced Technology Solar Telescope; Maui Electric Co., Inc.; and Hawaiian Telcom.

impacts on visual resources.[37]  The EA additionally concluded that the Management Plan would have some beneficial impacts to "baseline noise levels from implementation of noise reduction requirements for any construction activity," and therefore, the cumulative impacts combined with the Management Plan's requirements for noise management would be less than significant.

Considering cultural and historic resources within the Observatory Site, the EA stated "that there have been impacts on traditional cultural resources resulting from past and ongoing actions" and that "[o]ver the years, development at the [Observatory Site] has displaced and damaged cultural resources."  The EA further observed that past, present, and reasonably foreseeable future actions have had adverse impacts on cultural and traditional resources within the Observatory Site, but it found that the Management Plan's incremental impact on cultural resources would be less than significant and "would not substantially contribute to the adverse impacts from past, present, and reasonably foreseeable future activities on cultural resources."  The EA additionally found that past and ongoing actions have resulted in less than significant impacts

---

[37]    The EA observed that the proposed Telescope Project "would have adverse impacts on visual resources beyond those addressed in the [Management Plan], and [that] those have been analyzed elsewhere."

on historic resources and that implementing the Management Plan "would not combine with any other actions to produce incrementally different impacts on historic or archeological resources."

Thus, the EA expressly considered the incremental impact of implementing the Management Plan when added to past, present, and reasonably foreseeable future actions, including the Telescope Project, and it concluded that the Management Plan's cumulative impact on each resource considered would be less than significant, would be beneficial, or would result in no change. As Kilakila has not argued that any individual management activity implemented by the Management Plan may cause an adverse impact, Kilakila has not shown that the EA's conclusion as to the Management Plan's cumulative impact is clearly erroneous.

Accordingly, the record does not demonstrate that UH failed to follow proper procedures under HEPA or HAR § 11-200-12 or that UH failed to adequately consider the Telescope Project's impacts before concluding that the Management Plan would have no significant environmental impact. Consequently, UH's negative declaration is not clearly erroneous, and thus UH was not required to prepare an environmental impact statement for the Management Plan. Further, the record does not indicate that there is any genuine issue as to any material fact relating to

45

FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER

whether UH complied with the requirements under HEPA and its implementing regulations or as to whether UH adequately considered all environmental impacts before issuing its negative declaration.  Therefore, the circuit court did not err by granting summary judgment in favor of UH and DLNR and in denying summary judgment to Kilakila.

## V.  Conclusion

Accordingly, the ICA's Judgment on Appeal is affirmed for the reasons stated herein.



| | |
|---|---|
| David Kimo Frankel and Sharla Ann Manley for petitioner Kilakila 'O Haleakalā | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| | /s/ Sabrina S. McKenna |
| Darolyn H. Lendio, Bruce Y. Matsui, Lisa Woods Munger, Lisa A. Bail and Christine A. Terada for respondents University of Hawai'i and David Lassner, in his official capacity as Chancellor of the University of Hawai'i at Mānoa | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |

William J. Wynhoff and
Julie H. China
for respondents
Department of Land and Natural
Resources, Board of Land and
Natural Resources and Suzanne
Case, in her official capacity
as Chairperson of the Board of
Land and Natural Resources