**Electronically Filed
Supreme Court
SCAP-22-0000601
21-FEB-2025
07:50 AM
Dkt. 13 OP**

SCAP-22-0000601

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

UNITE HERE! LOCAL 5,
Plaintiff-Appellant,

vs.

PACREP LLC; CITY AND COUNTY OF HONOLULU,
a municipal corporation,
Defendants-Appellees.
(CAAP-22-0000601; CIV. NO. 1CC131000047)

_____

UNITE HERE! LOCAL 5,
Plaintiff-Appellant,

vs.

PACREP 2 LLC; CITY AND COUNTY OF HONOLULU,
a municipal corporation,
Defendants-Appellees.
(CAAP-22-0000602; CIV. NO. 1CC141000753)

_____

APPEALS FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CAAP-22-0000601 and CAAP-22-0000602 (consolidated);
CIV. NOS. 1CC131000047 and 1CC141000753 (consolidated))

1

FEBRUARY 21, 2025

RECKTENWALD, C.J., McKENNA, EDDINS, GINOZA, AND DEVENS, JJ.

OPINION OF THE COURT BY McKENNA, J.

## I. Introduction

UNITE HERE! Local 5 ("Local 5") is an organized labor union representing approximately 10,000 hotel and restaurant employees in the State of Hawai'i. PACREP LLC and PACREP 2, LLC (together, "PACREP")[1] are developers of the condominium hotel projects at 2121 Kūhiō Avenue ("2121" or "2121 Kūhiō") and 2139 Kūhiō Avenue ("2139" or "2139 Kūhiō") (together, "Projects") in Waikīkī, now completed and almost all units sold, known as the Ritz-Carlton Residences, Waikīkī Beach. The City and County of Honolulu ("City") is a municipal corporation. Its Department of Planning and Permitting ("DPP") is the accepting agent for the Final Environmental Assessments ("FEAs") for 2121 and 2139 and is the agency which issues findings of no significant impact ("FONSI").

This case arises out of PACREP's development of the Projects. The record reflects that PACREP first identified 2121 as a possible project in March 2011. Several days before

---

[1] PACREP 2 was not formed until December 5, 2013, after PACREP 1 and is a subsidiary of PACREP. PACREP 2 shares the same address as PACREP; both PACREP and PACREP 2 are incorporated in Delaware and list Jason Grosfeld (the manager of PACREP) as an officer. It appears Jason Grosfeld was with Martell Capitol Group LLC of Los Angeles. It also appears Irongate, a Los Angeles real estate development firm, which had developed the Trump International and the Watermark in Honolulu, was also involved. This opinion treats all of these and other relevant entities as "PACREP."

2

submitting an offer to purchase that lot in August 2011, PACREP learned that the adjoining 2139 Kūhiō, owned by Food Pantry, Ltd. ("Food Pantry"), was the subject of a previous joint development project with 2121 Kūhiō, and also began pursuing acquisition of that parcel.

By November 2011, PACREP submitted a confidential offer to purchase the 2139 Kūhiō lot, but hid this from its environmental review consultant for 2121 Kūhiō.

PACREP then began the environmental review process for 2121 in April 2012. PACREP and DPP went back and forth on the sufficiency of its draft environmental assessment ("DEA"). PACREP's October 5, 2012 building plan later submitted with its Waikīkī Special District ("WSD") building permits showed the podium jutting nearly eight feet into the 2139 lot. DPP finally accepted the FEA for 2121 and issued a FONSI on November 26, 2012. The 2121 environmental review process included many references to 2139. The FEA approved for 2121 depicted the podium jutting out of the 2121 building up to the 2139 site.

On January 7, 2013, Local 5 filed suit in the Circuit Court of the First Circuit for the State of Hawai'i ("circuit court"), challenging the FEA for 2121 under HRS chapter 343 (2010) (Hawai'i Environmental Policy Act) and Hawai'i Administrative

Rules ("HAR") chapter 11-200 (eff. 1996) (repealed 2019 and replaced by chapter 11-200.1) (collectively, "HEPA").[2]

Despite various HEPA and permit documents for 2121 mentioning 2139 and treating the two parcels as one project, PACREP did not officially acquire the 2139 Kūhiō property from Food Pantry until March 2013. The 2139 FEA described the Projects as being two separate but adjacent condo-hotel buildings that share a podium for "shared resident services, recreational amenities, vehicular access, and off-street parking." DPP accepted the 2139 FEA and issued a FONSI on February 10, 2014.

On March 24, 2014, Local 5 filed a second lawsuit in the circuit court, which challenged the 2139 FEA for the same reasons as the 2121 FEA. This complaint, however, also alleged

---

[2]     Case number 1CC131000047. HRS Chapter 602A, which created our environmental courts, did not come into effect until July 1, 2015. Also, the FEAs at issue are governed by previous HEPA rules under HAR chapter 11-200. HAR § 11-200.1-32(b) (eff. 2019) provides in relevant part:

> [c]hapter 11-200 shall continue to apply to environmental review of agency and applicant actions which began before the adoption of chapter 11-200.1[.] For EISs, if the EIS [preparation notice] was published by the office prior to the adoption of this chapter and the final EIS has not been accepted within five years from the implementation of this chapter, then the proposing agency or applicant must comply with the requirements of this chapter.

The 2121 FEA was accepted in 2012 and the 2139 Project FEA was accepted in 2014, before the adoption of HAR 11-200.1 in 2019. Hence, Chapter 11-200 applies.

improper segmentation of the environmental review process.[3]  On January 27, 2015, the cases were consolidated in the circuit court.  The parties filed various motions for summary judgment.

PACREP also obtained WSD building permits and height variances for both 2121 and 2139.

While the lawsuits and motions were pending, the Projects were completed and almost entirely sold off.  A temporary certificate of occupancy for 2121 was issued on January 19, 2016, and, for 2139, on July 13, 2018.  The final certificates of occupancy for both Projects were issued on April 14, 2021.

On April 13, 2022, the circuit court held a hearing on all the pending motions.[4]  The circuit court ruled in favor of PACREP on all the motions.

On October 14, 2022, Local 5 filed notices of appeal.  On October 10, 2023, the consolidated appeals were transferred to this court.

On appeal, Local 5 challenges the circuit court's rulings. Local 5 contends the Projects' FEAs are insufficient because they failed to discuss potential use of condo-hotel units as permanent residences.[5]  It also argues the FEAs are insufficient

---

[3]     Case number 1CC141000753.

[4]     The Honorable James H. Ashford presided.

[5]     In the meantime, in a separate case, Unite Here! Local 5 v. Department of Planning and Permitting, this court held that Local 5's due process rights were violated when the DPP Director, without affirmative notice to Local 5,

due to improper segmentation and that the cases are not moot. It asks this court to find the FEAs insufficient and void any previous approvals and permits for the Projects until a proper environmental review has been completed.

For the reasons discussed below, we hold that (1) these cases are not moot because effective relief in the form of proper environmental review can still be granted and, in any event, because the public interest exception applies; and (2) there was improper segmentation of environmental review of the two towers under the double independent utility test. We also hold that the appropriate remedy for a HEPA violation is a matter of equitable discretion and therefore does not require invalidation of permits and destruction of completed projects. We further hold that whether a challenger moved for injunctive relief after filing a lawsuit alleging HEPA violations is a factor that can be considered in determining an appropriate remedy if a court finds a HEPA violation after a project's completion.

Hence, we remand to the circuit court to address whether, under the rule of reason, the FEAs for 2121 and 2139 were sufficient in addressing the environmental effects of the

---

removed a restrictive covenant ensuring that any conversion of hotel units in the 2121 project would comply with Land Use Ordinance ("LUO") requirements, when Local 5 had advocated for the covenant. 145 Hawai'i 453, 466, 454 P.3d 394, 407 (2019).

Projects, which are further discussed below, as one combined project.  If not, the circuit court is to determine whether a new environmental assessment ("EA") or environmental impact statement ("EIS") addressing the Projects must be prepared.

## II.  Background

### A.  Factual background

#### 1.  2121 Kūhiō & 2139 Kūhiō Joint Development Agreement of December 2000

In December 2000, the DPP approved a Conditional Use Permit, 2000/CUP-98, for a Joint Development Agreement of the properties at 2100 Kalākaua Avenue, 2121 Kūhiō Avenue, and 2139 Kūhiō Avenue, which allowed four parcels to be treated and recognized as one zoning lot for development purposes ("joint development agreement").  These four parcels are the primary parcels for the Projects.

#### 2.  Negotiations for 2121 and 2139 and the 2121 environmental review process

PACREP first identified potential development opportunities for 2121 Kūhiō in March 2011.  By August 6, 2011, PACREP learned of the previous joint development agreement.  PACREP therefore began exploring the possibility of also acquiring and developing 2139 Kūhiō.

On August 9, 2011, PACREP submitted its initial offer to purchase 2121 Kūhiō.  The next day, PACREP pulled real property information on 2139 Kūhiō.  PACREP was then invited to submit a

final and best offer for 2121 Kūhiō, which it did on September 9, 2011.

The Projects triggered HEPA because they were within the WSD and also involved potential sidewalk and infrastructure upgrades to City streets.  See HRS § 343-5(a)(1) & (5) (2010).

On September 21, 2011, PACREP was advised by Keith Kurahashi ("Kurahashi"), its environmental review consultant, that 2121 was going to require an EA; Kurahashi also explained that any significant changes would require a new EA.

On October 11, 2011, PACREP internally discussed that development rights and restrictions on the 2139 lot would be resolved if PACREP owned the property.  On October 13, 2011, PACREP internally discussed researching the maximum capacity for a project on both 2121 and 2139.  That day, PACREP also informed consultants that it was looking into purchasing 2139 Kūhiō and asked them to create two scenarios:  (1) development of just 2121 Kūhiō and (2) development of both 2121 and 2139 Kūhiō. PACREP's architect asked whether the development of both Kūhiō addresses would be done jointly or separately; PACREP responded "[a]ssume joint but interested to here [sic] if there's a diff."

On October 14, 2011, PACREP moved forward with the purchase and sale agreement of the 2121 Kūhiō property.[6]

---

[6]     The purchase and sale agreement describes the sale of the property by K3 Owners LLC to Martell Capital Group, LLC, the company for which PACREP is

On October 28, 2011, PACREP discussed with its architect the idea of merging 2121's podium with a podium for 2139. On November 11, 2011, the architect provided PACREP with renderings that established a podium size and assumed a 50/50 split of the podium between 2121 and 2139. That same day, PACREP conveyed proposed terms to Food Pantry to purchase 2139 Kūhiō, which generally involved providing Food Pantry with space in its development with a long-term, below market lease.

On October 27, 2011, however, PACREP entered a confidentiality agreement with Food Pantry regarding its interest in purchasing the 2139 Kūhiō lot.

On November 16, 2011, the Board of Water Supply ("BWS") informed PACREP that "[t]he existing water system is adequate to accommodate the proposed Option A (384 hotel condo suites and hotel residences, commercial restaurant, and office space), and Option B (526 hotel condo suites and hotel residences, commercial, restaurant, and office space) development." PACREP then filed a sewer application with DPP's Wastewater Branch on December 20, 2011, for 459 units at 2121 Kūhiō. Both the DEA and FEA said the "DPP approved a Sewer Connection Application,

---

the developer. The property consists of one and a half acres located at 2109 Kūhiō Avenue and 2114 Lau'ula Street in Honolulu, Hawai'i, which includes the 2121 Kūhiō property.

on January 17, 2012, for the 459-unit condo hotel development"
and that Tower 1 was going to include 459 units.

On January 30, 2012, Casey Federman sent an internal email
asking whether PACREP should submit one EA for both 2121 and
2139. The email recognized that DPP prefers full disclosure of
the complete project:

> Food Pantry - Debate as to whether we submit one EA
> application for both sites even before a deal is reached
> with the owners of FP. DPP looks favorably upon full
> disclosure if we intend to potentially joint develop the
> two parcels. We're going to push FP [Food Pantry] for a
> response to our offer to hopefully eliminate this potential
> staging issue.

On February 1, 2012, Food Pantry informed PACREP that its
appraiser was analyzing the value of the commercial unit PACREP
was proposing to provide. PACREP responded that it was
beginning the environmental review process for 2121. PACREP
said "We have suggested that they [our consultants] simply
compile data and base their reports on our site [2121] and
suggested that we could amend later adding your site [2139]."
Jason Grosfeld at PACREP indicated the consultants "have told us
this would be inadvisable since the city looks unfavorably on
such major amendments and would likely make us start all over
again[]" and that "[t]hey are also sensitive to the city feeling
bait-and-switched which supposedly has happened before." On
February 22, 2012, PACREP discussed the development

possibilities for both 2121 Kūhiō and 2139 Kūhiō with its architect.

In April of 2012, PACREP submitted its first DEA, for 2121 only, which described the project as a "condominium hotel" including "459 units." This DEA indicated that 2121 would include "a five story podium with the ground floor lobby, three levels of parking and fifth floor of hotel support uses."

In its May 10, 2012 response, DPP provided comments on the 2121 DEA and requested seventeen corrections. The letter identified the DEA as concerning "2121 and 2139 Kūhiō Avenue; 2100 Kalākaua Avenue – Waikīkī."

On July 5, 2012, PACREP submitted a revised DEA. PACREP listed the location as including the other development agreement parcels, including the Food Pantry site. In the introduction section of this revised DEA, PACREP stated that it "understands the long range plan for the Food Pantry property is to develop a grocery store in a low-rise structure." In the section entitled "Physical Characteristics," the revised DEA indicated that "[t]he Project will include a five story podium with the ground floor lobby, three levels of parking and a fifth floor of hotel support uses. Above this podium will be the 29-story tower." At that time, building plans for Tower 1 appeared to show the base of the podium sitting at the edge of the property line

between 2121 Kūhiō and 2139 Kūhiō, with the podium constructed entirely in the 2121 Kūhiō lot.

On July 6, 2012, DPP submitted the revised 2121 DEA to the Office of Environmental Quality Control ("OEQC") to be published in the "The Environmental Notice." DPP anticipated a finding of no significant impact.

On July 23, 2012, the OEQC published PACREP's DEA for 2121. In its letter authorizing publication, DPP noted the applicant as "PACREP LLC . . . Jason Grosfeld," and the location as including "2139 Kūhiō Avenue (parcel 43)," and listed the "fee owner" of "2139 Kūhiō Avenue (parcel 43)" as "Food Pantry Ltd."

At the same time PACREP was receiving feedback about the revised 2121 Kūhiō DEA and preparing its FEA, it was also moving forward with plans to purchase and develop the 2139 Kūhiō lot. An August 17, 2012, a PACREP internal email from Jason Grosfeld to Brendan Guerin said: "Do not share with anyone. Kurahashi and other consultants included. I think we have a good shot at food pantry site now. Let's discuss."

Five days later, DPP sent PACREP comments on the DEA, including comments from various DPP divisions and requested further analysis of the 350-foot building height.

The same day, Local 5 sent a letter to PACREP and the City expressing concerns regarding the impact of a 350-foot building

height and that 2121 could one day be used for permanent residences rather than as a hotel.

On September 5, 2012, a PACREP email from Michael Hreczny regarding "LRT-Food Pantry Study" discussed and attached three options for use of 2139 Kūhiō.  The next day, another PACREP internal email from Brendan Guerin regarding "LRT-Food Pantry" mentioned "two more options" -with Jason Grosfeld responding "Can you show the car drop off and driveways for phase 2?"

On September 12, 2012, PACREP sent a preliminary FEA for 2121 to DPP for review and approval.  PACREP's October 5, 2012 internal building plans showed the east wall of the podium of 2121 Kūhiō jutting roughly eight feet onto the 2139 Kūhiō lot.

On October 16, 2012, DPP rejected the preliminary FEA because all comments in its August 22, 2012 letter had not yet been addressed.

On October 18, 2012, an internal PACREP email indicated PACREP planned to have Kurahashi submit the final 2121 Kūhiō FEA on October 29, 2012, and that PACREP's WSD permit application "would ideally be submitted . . . 2 days after the final EA . . . and be accepted the following week right after the FONSI is issued."

An October 22, 2012 PACREP internal email from Brendan Guerin referred to the status of the 2139 or Food Pantry site as follows:

> 1. currently the design for the podium extends onto food pantry parcel by approx 7' so as to clear the utilities in the service drive and the utility easement (which is going away). we need direction on how to proceed with this. if the massing is to remain as is, i imagine some sort of legal document will need to accompany our submission authorizing us to build on the adjacent parcel. (this is a keith and/or owen issue)
>
> 2. ph 2 site design - jason and i discussed the possibility of pausing on the phase 1 work for a few weeks to allow us to get into the phase 2 tower design. this needs to be done so as to confirm the manner in which the two phases will integrate and ideally is advanced enough prior to the phase 1 wsd submission (and general consultant advancement) so as to avoid redesign work down the road.

Two minutes later, Jason Grosfeld responded: "Not a word about phase two to anyone inc Keith."

On October 24, 2012, PACREP sent a letter to DPP with responses to DPP's comments. Two days later, PACREP sent a second preliminary FEA to DPP for review and acceptance. It mentions the podium and how it will integrate with and support the 29-story tower above. But in direct contradiction to PACREP's October 5, 2012 plans later submitted with its WSD permit application, PACREP's October 26, 2012 submission still appears to depict the podium jutting out of the building but only going right up to the property line between 2121 and 2139.

On November 26, 2012, DPP accepted PACREP's FEA for 2121 and instructed the OEQC to publish the FEA in its next edition of the Environmental Notice. DPP determined that an EIS was not required and issued a FONSI. The FEA listed the applicant as "PACREP LLC . . . Jason Grosfeld," and the location as including

14

"2139 Kūhiō Avenue (parcel 43)." PACREP's depiction of the building, viewed from Kūhiō, showed an off-center orientation of the tower with its the podium jutting out of the building.

Then, on December 11, 2012, PACREP submitted a request for a WSD permit for a building height of 350 feet in accordance with LUO chapter 21, section 21-9.80-4(G)(3) (1990). PACREP's building plans internally dated October 5, 2012, submitted to the DPP with the WSD permit application showed the entire east wall of the podium of 2121 Kūhiō overhanging roughly eight feet onto the 2139 Kūhiō lot.

Then, on January 7, 2013, Local 5 filed a complaint for declaratory relief in the circuit court, challenging the sufficiency of the 2121 FEA under HEPA ("2121 complaint").[7]

On March 19, 2013, the city council passed Resolution No. 13-2 granting a height variance for 2121, which also stated that a portion of the 2121 building would encroach into the 2139 parcel.

On January 19, 2016, a temporary certificate of occupancy was issued for 2121.

---

[7] Case number 1CC131000047.

### 3. 2139 environmental review process

On or about March 8, 2013, an agreement was apparently signed providing PACREP with the right to acquire the 2139 parcel through an option to lease or purchase.[8]

According to Local 5, despite public backlash from the news that the public was deceived, PACREP chose to move forward with a separate EA for 2139, also referred to as Phase 2, rather than submit a comprehensive environmental review document for both towers.

After being informed about the 2139 project, PACREP's proposed new environmental consultant, who was to take on Kurahashi's role for 2139, declined to be further considered for the project, expressing segmentation concerns that make the EA review and process "extremely difficult."

Kurahashi also expressed concerns regarding segmentation and blocking views with the 2139 project:

> He [the other proposed consultant] has legitimate concerns about EA segmentation, which was one of my concerns as well. It all relates to when you approached Food Pantry and when you began arranging the purchase of their property.
>
> I told him that I was not aware of any plan to purchase Food Pantry as we went through the process, and that I felt that Food Pantry would eventually build a new low-rise Food Pantry on the property. We only discussed acquiring some of their density.

---

[8] A limited warranty deed for the 2139 Kūhiō property between Food Pantry and PACREP was not executed until March 24, 2015, but states that the option to lease or purchase was entered into on March 8, 2013 and was transferred to PACREP 2 on May 22, 2014.

16

> I like the idea of offering this to David Tanoue at RM Towill.[9]
>
> This is a small town and most planners will understand the problems with an appearance of segmentation and the difficulty in putting a second tower that blocks Four Paddles['] view based on the publicity our project had.

On October 10, 2013, Towill submitted a DEA for 2139. On November 12, 2013, Towill submitted a revised DEA. DPP accepted the 2139 DEA on November 26, 2013, and submitted it to the OEQC. The OEQC published notice of the 2139 DEA on December 8, 2013. In the DEA (and in the later FEA) for 2139, DPP described the project as:

> The construction of a new 39-story, 350-foot high condo-hotel with up to 280 units, including support facilities, resident services, recreational amenities, streetscape improvements, and commercial uses. **The proposed development will share an 8-story building podium with the adjacent development (2121 Kūhiō, currently under construction) that contains shared resident services, recreational amenities, vehicular access, and off-street parking.**

The 2139 DEA and FEA also lists the tax map keys for the 2139 Project as including the "Adjacent Property." The Projects were treated as one.

> The Applicant is in the process of amending the Agreement [JDA] to reallocate building density in excess of what is required for the 2121 Kūhiō Tower to Parcel 43. The amended CUP and JDA would join the parcels that comprise the 2121 Kūhiō and 2139 Kūhiō Projects such that they would be treated and recognized as one zoning lot for development purposes.

---

[9]    Tanoue had been the DPP Director until October 2012, when he apparently joined R.M. Towill Corporation, and is mentioned in various parts of DPP's record regarding 2121.

17

On January 7, 2014, DPP provided PACREP with comments from the Site Development Division, the Planning Division, and the Urban Design Branch regarding the 2139 DEA's design coordination with 2121. The same day, Local 5 wrote to PACREP expressing concerns about impacts from the building height and orientation, the possibility that 2139 would not be used as a hotel, and cumulative impacts with other projects on Oʻahu.

The next day,[10] the OEQC also sent comments to DPP regarding the 2139 DEA, recommending a number of changes and discussing how "this project is closely affiliated to the 2121 Kūhiō Project."

On February 10, 2014, DPP accepted the 2139 FEA, determined an EIS was not required, and issued a FONSI.

The FEA indicated PACREP sought to "reallocate building density in excess of what is required" for 2121 to 2139 and that they would be treated and recognized as one zoning lot for development purposes.

On March 24, 2014, Local 5 filed a complaint in the circuit court ("2139 complaint") challenging the sufficiency of the 2139 FEA and DPP's FONSI determination.[11]

---

[10] The letter is misdated as January 8, 2013.

[11] Case number 1CC141000753.

18

On July 13, 2018, a temporary certificate of occupancy was issued for 2139. The final certificates of occupancy for both towers were issued on April 14, 2021.

## B.     Circuit court proceedings

In the 2121 complaint, Local 5 claimed the 2121 FEA did not properly evaluate the 2121 project because it failed to disclose:  (1) the possibility of long-term residential use of units; (2) the lack of mitigation measures to require 2121 to operate as a hotel and provide jobs in perpetuity; and (3) the impact of 2121's building height and orientation on public views identified in the WSD Design Guidelines ("WSD guidelines"). Local 5 sought an amendment of the 2121 FEA, an EIS to assess significant views and view planes, to enjoin "further processing of permits or approvals," and an award of attorneys' fees and costs.

In its 2139 complaint, Local 5 raised the same issues to allege insufficiency of the environmental review process.  Local 5 also alleged that the 2139 FEA did not adequately disclose the cumulative impact of the project and was improperly segmented from 2121 based on HAR § 11-200-7 (eff. 1996).  Local 5 also alleged that because the Projects' FEAs do not properly disclose their potential uses as permanent residences, the representation that the Projects would create over 700 hotel jobs was illusory and wholly contingent on the ownership of the units.  Local 5

19

filed an amended complaint to include a claim for declaratory relief on March 28, 2014.

On January 27, 2015, the complaints were consolidated and set for trial.  Local 5 filed a motion to compel on May 4, 2015, seeking discovery.  The motion sought to compel PACREP to respond to requests for answers to interrogatories, admissions, and for production of documents.  The circuit court denied the motion based on the ICA's decision in Kilakila 'O Haleakala v. University of Hawai'i, 134 Hawai'i 86, 332 P.3d 688 (App. 2014), which held that the sufficiency of an environmental assessment is a question of law to be determined based solely on the administrative record.

This court then held on certiorari "that in a declaratory action brought to challenge an agency's determination that an environmental impact statement is not required, judicial review is not restricted to an administrative record."  Kilakila 'O Haleakala v. University of Hawai'i ("Kilakila"), 138 Hawai'i 364, 368, 382 P.3d 176, 180 (2016).  Hence, on January 31, 2017, the circuit court granted a motion for reconsideration and allowed discovery.  It appears some discovery then took place, but that these cases were inactive for several years, until a status conference was held on January 7, 2022.

20

At no time did Local 5 file a motion requesting injunctive relief.

## C.  Motions underlying this appeal

The various motions for summary judgment described below were finally heard in April 2022.

### 1.  PACREP's original MSJs

On February 19, 2016, PACREP filed two motions for summary judgment as to the FEAs for 2121 and 2139.  The motions made nearly identical arguments.

PACREP first argued the FEAs were legally sufficient under HEPA rules.  It disputed Local 5's assertion that the 2121 FEA should have assessed the effects of use of the units as full-time residences.  PACREP argued the actual standard for determining the necessity of an EIS, based on HRS § 343-5(c) (2010), is whether "the proposed action will likely have a significant effect on the environment," quoting Kepoʻo v. Kane, 106 Hawaiʻi 270, 288-89, 103 P.3d 939, 957-58 (2005) (emphasis in the original).

PACREP further argued HAR § 11-200-10 (eff. 1996) requires that an FEA make disclosures regarding the "proposed action," but not regarding other actions or future conversions.  According to PACREP, "the proposed action" was to build condominium hotel units, not multifamily dwellings.  PACREP also

argued the FEAs did disclose possible long-term residential use.[12]  PACREP argued DPP's decision to accept the FEAs without mitigation measures to limit future use was not arbitrary and capricious because HEPA does not require mitigation measures to prevent a future alternate hypothetical use.

Next, PACREP argued DPP's decisions that the towers' building heights and orientation were not likely to significantly affect the environment or "substantially affect scenic vistas and view planes" were not arbitrary and capricious.  It argued the FEAs thoroughly analyzed the potential impact of the heights and orientations on view planes and that the buildings were consistent with WSD guidelines.

PACREP then argued DPP rightfully "exercise[d] its legislatively granted discretion" in finding that EISs were not required.  HAR § 11-200-12(b) (eff. 1996) lists thirteen factors to determine whether an action shall be deemed to have a

---

[12]    The 2121 FEA described 2121 as containing "individual units [that] will be sold to investors, who are expected to place the units back into the hotel pool.  We expect that investors may stay in their unit part of the year and will be offered hotel services during those periods."  PACREP also stated "[it] ha[d] no intention of converting this Project to a residential condominium[.]"

The 2139 FEA described 2139 as a building in which "individual hotel units will be sold to purchasers, who are expected to elect to rent their units on a transient basis."

significant effect on the environment ("significance factors").[13] PACREP argued none of those factors existed.

PACREP made additional arguments specific to 2139. In response to Local 5's claim that the 2139 FEA did not adequately disclose and analyze the cumulative impact of 2139 in light of all other proposed projects in Waikīkī, PACREP argued it considered and analyzed "the relevant past, present, and reasonably foreseeable future actions" in its FEA.

---

[13] An action will be determined to have a significant impact on the environment, warranting an EIS, if the action involves at least one of the following thirteen factors:

> (1) Involves an irrevocable commitment to loss or destruction of any natural or cultural resource;
> (2) Curtails the range of beneficial uses of the environment;
> (3) Conflicts with the state's long-term environmental policies or goals and guidelines as expressed in chapter 344, HRS, and any revisions thereof and amendments thereto, court decisions, or executive orders;
> (4) Substantially affects the economic or social welfare of the community or State;
> (5) Substantially affects public health;
> (6) Involves substantial secondary impacts, such as population changes or effects on public facilities;
> (7) Involves a substantial degradation of environmental quality;
> (8) Is individually limited but cumulatively has considerable effect upon the environment or involves a commitment for larger actions;
> (9) Substantially affects a rare, threatened, or endangered species, or its habitat;
> (10) Detrimentally affects air or water quality or ambient noise levels;
> (11) Affects or is likely to suffer damage by being located in an environmentally sensitive area such as a flood plain, tsunami zone, beach, erosion-prone area, geologically hazardous land, estuary, fresh water, or coastal waters;
> (12) Substantially affects scenic vistas and view planes identified in county or state plans or studies; or,
> (13) Requires substantial energy consumption.

HAR § 11-200-12(b).

23

PACREP also argued there was no improper segmentation of the 2121 and 2139 FEAs due to the timeline of the Projects. It argued DPP issued its FONSI for 2121 on November 26, 2012, and it did not acquire rights to the 2139 parcel until March 2013. PACREP asserted that 2121 was a "stand-alone" condominium hotel project that began its development process as a sole tower and would have so continued if Food Pantry had retained the 2139 parcel, as was anticipated in the 2121 FEA. PACREP asserted HAR § 11-200-7 is meant to prevent the pursuit of "projects in a piecemeal fashion" and that segmentation cases generally focus on applicants who have "avoided environmental review," citing Unite Here! Local 5 v. City & County of Honolulu, 120 Hawai'i 457, 467, 209 P.3d 1271, 1281 (App. 2009) and Kahana Sunset Owners Ass'n v. County of Maui, 86 Hawai'i 66, 74, 947 P.2d 378, 386 (1997) ("Kahana Sunset").

PACREP argued there was no improper segmentation as both 2121 and 2139 underwent extensive environmental review. PACREP argued the 2139 EAs "considered and evaluated the 2139 Project together with the 2121 Project." (Emphasis in original.)

2.   **Local 5's segmentation MSJs**

On February 19, 2016, Local 5 filed essentially identical motions for summary judgment alleging unlawful segmentation. Local 5 argued that environmental review should not have been

24

segmented because 2121 and 2139 are part of the same joint development agreement and owned by the same entity, PACREP always intended to develop both towers, and 2139 is the second phase of 2121.

Local 5 argued that if PACREP had prepared a single EA for both towers, it would have triggered several significance factors, thus requiring preparation of an EIS. Local 5 argued the following factors required an EIS: (1) substantial effects on the economic and social welfare of the community or State; (2) substantial secondary impacts; (3) cumulative considerable effect on the environment or a commitment to larger actions; and (4) substantial effects on scenic vistas and view planes as identified in county or state plans or studies.

### 3. City's substantive joinders

On February 23, 2016, the City filed substantive joinders to PACREP's motions for summary judgment. The City largely echoed PACREP's arguments. In addition, in response to Local 5's claim that the FEAs failed to include mitigation measures requiring the Projects to operate as hotels and provide jobs in perpetuity, the City argued that HEPA only requires discussion of mitigation measures to address negative impacts of a proposed action, not to "maximize community benefits." Further, with respect to impacts on public views, the City argued that DPP took a "hard look," given the EAs' extensive discussion and

analysis of visual impacts, which included "over 60 graphic depictions of the Project and its visual impacts."

### 4. PACREP's opposition to segmentation MSJ

In its March 7, 2016 memorandum in opposition to Local 5's segmentation motion, PACREP did not dispute that building plans submitted with its December 2012 WSD permit application for 2121 Kūhiō depicted overlap of the 2121 Kūhiō podium onto 2139 Kūhiō. PACREP maintained, however, that the WSD "permit process is a completely separate application and process from the environmental review process[,]" and that conflicting building plans it submitted for the 2121 Kūhiō environmental review process and the WSD "in no way evidence that PACREP intended to develop the [2139 Kūhiō lot.]"

### 5. Local 5's oppositions and counter MSJs

On March 8, 2016, Local 5 filed nearly identical memoranda in opposition to PACREP's motions and included counter MSJs. Local 5 argued that the FEAs were deficient in multiple ways, but that the court need only find one to hold them legally insufficient.

First, Local 5 asserted that the FEAs mischaracterized each project as "a simple hotel" when they should have disclosed and analyzed the impact of any permanent residents along with the potential use of all units as permanent residences.

26

Local 5 then asserted the FEAs should have included an impacts and mitigation section addressing the permanent residential use of each project and the primary, secondary, and cumulative impact of both projects together. Local 5 further argued the FEAs were insufficient because the Projects' Ewa/Diamond Head orientation violated WSD guidelines.[14]

Local 5 also argued that the FEAs failed to address the "no action" alternative. The "no action" alternative requires an analysis of the environmental impact of the proposed project not proceeding as a baseline for all other alternatives to be measured against. Local 5 concluded by arguing that the 2139 FEA was improperly segmented from the 2121 project, and vice versa.

### 6. PACREP's supplemental MSJ on mootness

On March 16, 2022, PACREP filed a MSJ based on mootness, asserting that no justiciable controversy existed and no effective relief could be granted. PACREP argued that because the Projects had been built and sold to third parties, the court could not grant relief as an additional EIS would serve no

---

[14]    DPP recognized and permitted this violation.

purpose.  PACREP also argued that no exceptions to the mootness doctrine applied.[15]

**7.    Circuit court's hearing and rulings on the motions**

On April 13, 2022, the circuit court held a hearing on all the pending motions.  On Local 5's MSJ based on segmentation, the court ruled that there was not segmentation under any of the four prongs in HAR 11-200-7.[16]

The circuit court also granted PACREP's MSJs and the City's substantive joinders, and also denied Local 5's countermotions for summary judgment.

On April 14, 2022, the circuit court issued a minute order granting PACREP's MSJs based on mootness, ruling that the case was moot and no exceptions applied, ruling that, with two completed projects, there would be no utility in issuing new EAs or an EIS.

---

[15]    PACREP specifically argued that neither the "capable of repetition yet evading review" nor the public interest exceptions applied.

[16]    The four prongs instructed that a group of proposed actions shall be treated as a single action when:

> (1) The component actions are phases or increments of a larger total undertaking;
> (2) An individual project is a necessary precedent for a larger project;
> (3) An individual project represents a commitment to a larger project; or
> (4) The actions in question are essentially identical and a single statement will adequately address the impacts of each individual action and those of the group of actions as a whole.

HAR 11-200-7.

Final judgments were entered on September 15, 2022.

## D.  Appellate proceedings

### 1.  Notices of appeal and transfer

On October 14, 2022, Local 5 filed notices of appeal.  On October 9, 2023, the ICA consolidated the appeals.  On October 10, 2023, the consolidated cases were transferred to this court.

### 2.  Briefing

#### a.  Local 5's opening briefs

Local 5's May 5, 2023 opening briefs allege the circuit court erred as a matter of law by concluding that (1) environmental review for the two phases was not improperly segmented into two EAs; (2) the two phases did not require a comprehensive EIS; (3) the FEAs were sufficient; and (4) the cases were moot because the two towers are fully constructed.

Local 5's opening briefs reiterate its arguments before the circuit court.  On appeal, Local 5 also contends the circuit court erred in deeming its claims moot because PACREP's actions are capable of repetition while evading review, as the selling or pre-selling of units would enable developers to avoid environmental review.  Local 5 further argues adjudication on the merits is in the public interest, as the public is harmed when developers can circumvent environmental review processes.

Local 5 additionally argues that under Hawaiʻi law, development permits and their conditions can be modified, even years after issuance, citing Morgan v. Planning Department, County of Kauai, 104 Hawaiʻi 173, 184, 86 P.3d 982, 993 (2004). Thus, Local 5 asserts that because the FEAs for the Projects are legally insufficient, any subsequent approvals are invalid and void.

### b.    City's answering briefs

The City's July 14, 2023 answering briefs also largely repeat its arguments before the circuit court.  The City also argues that with respect to the 2121 complaint, the circuit court did not err in denying Local 5's segmentation MSJ because that complaint did not allege improper segmentation, did not even mention the 2139 Project, and was not amended to include a segmentation allegation.  The City argues that even under the "double independent utility" test, the circuit court did not err because 2121's environmental review commenced long before PACREP acquired development rights for the 2139 land.  The City also asserts that nothing in the record suggests PACREP would not have pursued the 2139 Project but for approval of the 2121.

The City also argues that HEPA rules are designed to give latitude to the accepting agency as to the content of each EA, citing Price v. Obayashi, 81 Hawaiʻi 171, 183, 914 P.2d 1364,

1375 (1996). The City also argues that the FEAs need not have assessed the "no action" alternative because, under Hawai'i law, the "no action" alternative is only mandatory when preparing an EIS. Compare HAR 11-200-17 (eff. 1996) (an EIS must include a "rigorous exploration and objection evaluation of the environmental impacts of all such alternative actions[,] . . . including the alternative of no action."), with HAR 11-200-10, which does not discuss the "no action" alternative.

The City also contends the circuit court did not err by deeming the cases moot because further environmental review would not be meaningful. The City asserts that voiding permits now would raise vested rights and judicial takings concerns because the units have been sold to third-party purchasers and PACREP no longer has developmental control. The City also emphasizes that the environmental review process is intended to be informational and forward-looking and asserts the circuit court's mootness finding is consistent with this and the federal court interpretations of that intent citing, Molokai Homesteaders Coop. Ass'n, 63 Haw. 453, 465, 629 P.2d 1134, 1143 (1981) ("[T]he prescribed role of the EIS in the state environmental protection scheme is informational."); and Blue Ocean Pres. Society v. Watkins, 754 F. Supp. 1450, 1452 (D. Haw. 1991) ("Where the decision has already been made and carried out, and the action taken cannot be undone, there is absolutely

no function or role for an EIS.").  The City also argues the "capable of repetition but evading review" exception to the mootness doctrine does not apply, in part, because Local 5 did not seek a preliminary injunction.

### c.    PACREP's answering briefs

On August 28, 2023, PACREP filed its answering briefs, also repeating arguments below as well as arguments on appeal made by the City.  PACREP also argues the circuit court properly granted summary judgment because the Projects have been completed and the case is moot.  PACREP also argues there is no legal authority for invalidating an EA, requiring an EIS, and retroactively invalidating all issued permits where a project has been completely built, citing Native Village of Nuiqsut v. Bureau of Land Management, 9 F.4th 1201, 1211 (9th Cir. 2021) ("Nuiqsut") (deeming the case moot because drilling exploration project had been fully completed); and Blue Ocean Pres. Soc'y, 754 F. Supp. at 1459 (ruling that where two phases of an action have been completed, "any attempt to have those actions considered in a comprehensive EIS is, therefore, moot").  PACREP then repeated its argument that no exceptions to the mootness doctrine apply.

PACREP also argues that 2139 was not improperly segmented from 2121 because there is no evidence in the record that either project would not have been constructed except as part of the

larger integrated development.  PACREP asserts the Projects sharing a podium does not indicate they are part of a "larger total undertaking."  PACREP also maintains that 2121 did not make the construction of 2139 likely as it had independent utility and the 2139 property was not owned by PACREP at the time.

PACREP also argues the FEAs adequately discussed mitigation measures because they address the impact to public schools and on parks.  PACREP also asserts the FEAs properly analyzed cumulative impacts and also evaluated the "no action" alternative.

### d.    Local 5's reply briefs

On September 21, 2023, Local 5 filed reply briefs to PACREP's and the City's answering briefs.

Local 5 argues that completion of the towers does not render the case moot, positing that a live controversy exists until compliance with Chapter 343 is achieved.  It asserts a court can order additional environmental reporting and revocation of permits.

Local 5 also argues it can properly invoke the "capable of repetition" mootness exception because it did request injunctive relief in its complaints.[17]

Local 5 argues that in Nuiqsut, the Ninth Circuit held that plaintiffs were not required to have filed a motion for preliminary injunction where there was a short time frame between the time the suit was filed and completion of the project. 9 F.4th at 1209. Local 5 argues that, here, there was only a month between the time the lawsuit was initiated and DPP's approval of PACREP's essential permits.

Regarding segmentation, Local 5 argues PACREP would not have undertaken 2139 as proposed absent 2121's existence. Local 5 asserts the Projects fail Kia'i Wai o Wai'ale'ale v. Department of Water's "double independent utility" test, because 2139 would not have been built sans 2121. 151 Hawai'i 442, 464, 517 P.3d 725, 747 (2022) ("Kia'i Wai").

### III. Standards of Review

### A. Motion for summary judgment

A trial court's ruling on a motion for summary judgment is reviewed de novo under the right/wrong standard. Umberger v.

---

[17]    In both complaints, Local 5 requested "that the Court declare that the FEA is insufficient under the law and that an EIS be prepared, and *enjoin the Defendants from further processing until the fatal flaws are cured*[.]"

Dep't of Land and Nat. Res., 140 Hawai'i 500, 512, 403 P.3d 277, 289 (2017).

> Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

140 Hawai'i at 527-28, 403 P.3d at 304-05 (citations and brackets omitted).

B.    **Agency determinations under HEPA**

The legal adequacy of an EIS is a question of law. Price, 81 Hawai'i at 182, 914 P.2d at 1375.

> But for agency determinations under HEPA, the appropriate standard of review depends on the specific question under consideration. Generally, a court reviews agency determinations that involve factual questions under a clearly erroneous standard. An agency's conclusion of law that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case. However, whether or not an agency has followed proper procedures or considered the appropriate factors in making its determination is a question of law, and will be reviewed de novo.

Kia'i Wai, 151 Hawai'i at 454, 517 P.3d at 737 (cleaned up).

A finding of fact or a mixed determination of law and fact is clearly erroneous when

> (1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm

35

> conviction that a mistake has been made. We have defined "substantial evidence" as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

Id. (cleaned up).

We have recognized that

> [a] court is not to substitute its judgment for that of the agency as to the environmental consequences of its action. Rather, the court must ensure that the agency has taken a 'hard look' at environmental factors, and, if the agency has followed the proper procedures, its action will only be set aside if the court finds the action to be "arbitrary and capricious," given the known environmental consequences.

Unite Here! Local 5, 123 Hawai'i at 171, 231 P.3d at 444 (cleaned up).

We apply the "rule of reason" standard when reviewing an agency's determination of whether an EIS satisfies applicable legal requirements. Id. Concerning the adequacy of an EIS under the "rule of reason," we have stated

> an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate if it has been compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives.

Price, 81 Hawai'i at 182, 914 P.2d at 1375 (cleaned up).

Likewise, "although this case presents the question of the sufficiency of the State's compliance with regulations regarding an EA rather than an EIS, we recognize the same latitude in the HAR given to the accepting agency over EISs for EAs, and apply

the same standard in evaluating EAs." Hoʻopakele v. Dep't of Acct. & Gen. Servs., CAAP-14-0001328, at *3 (App. Jan. 12, 2016) (mem. op.).

C.   **Mootness**

Under Hawaiʻi law, mootness is a prudential concern of judicial self-governance founded in concern about the proper – and properly limited – role of courts in a democratic society. The mootness doctrine is properly invoked where events have so affected the relations between the parties that the two conditions for justiciability relevant on appeal – adverse interest and effective remedy — have been compromised. Wilmington Sav. Fund Soc'y, FSB v. Domingo, 155 Hawaiʻi 1, 9, 556 P.3d 347, 355 (2024).

## VI.   Discussion

Local 5 alleges the circuit court erred by concluding (1) environmental review for the two phases was not improperly segmented; (2) the two phases did not require a comprehensive EIS; (3) the FEAs were sufficient; and (4) the cases were moot because the two towers are fully constructed. We address the fourth and first issues, respectively, and remand the second and third questions to the circuit court.

We hold that (1) these cases are not moot even though the towers are fully constructed because effective relief in the

form of proper environmental review can still be granted and, in any event, because the public interest exception applies; and (2) environmental review for the two towers was improperly segmented based on the double independent utility test of HAR § 11-200-7(2) (eff. 1996). We also hold that the determination of an appropriate remedy based on a HEPA violation is a matter of equitable discretion and does not require invalidation of permits and destruction of completed projects. We further hold that whether a challenger moved for injunctive relief after filing a lawsuit alleging HEPA violations is a factor that can be considered in determining an appropriate remedy if a court finds a HEPA violation after a project's completion.

Accordingly, we vacate the circuit court's orders granting summary judgment in favor of PACREP and the City and denying Local 5's motion for summary judgment regarding improper segmentation as well as its final judgment. We remand these cases to the circuit court for further proceedings, as discussed below.

## A.   Local 5's claims are not moot

### 1.   Local 5's claims are not moot because effective relief — completion of requisite environmental review — is available

It is well-settled that the mootness doctrine

> encompass[es] the circumstances that destroy the justiciability of a suit previously suitable for determination. Put another way, the suit must remain alive

38

> throughout the course of litigation to the moment of final appellate disposition. Its chief purpose is to assure that the adversary system, once set in operation, remains properly fueled. The doctrine seems appropriate where events subsequent to the judgment of the trial court have so affected the relations between the parties that the two conditions for justiciability relevant on appeal—adverse interest and effective remedy—have been compromised.

Hamilton ex rel. Lethem v. Lethem, 119 Hawai'i 1, 5, 193 P.3d 839, 843 (2008) (cleaned up). A case is moot if the reviewing court can no longer grant effective relief. Cmty. Ass'ns of Hualalai, Inc. v. Leeward Plan. Comm'n, 150 Hawai'i 241, 253, 500 P.3d 426, 438 (2021).

Local 5 argues that these cases are not moot because this court can still grant effective relief by invalidating the EAs, which, in turn, will void and/or vacate the permits for which the EAs are conditions precedent. It appears Local 5 misapprehends the law as requiring invalidation of permits and destruction of projects if a HEPA violation is determined to exist.[18]

There is no binding precedent of this court addressing a situation like this, where a project has been completed and real property with significant value has already been conveyed to third parties. But there is persuasive precedent holding that

---

[18] For example, Local 5 cites to Kahana Sunset, in which we vacated the grant of a permit issued without the requisite environmental review. 86 Hawai'i at 75, 947 P.2d at 387. But there was no indication in that case that the project had been completed.

the remedy for a violation of environmental review requirements is a question of equitable discretion.  See, e.g., KAHEA v. Nat. Marine Fisheries Serv., Civil No. 11-00474 SOM-KSC, 2012 WL 1537442 at *3-7 (D. Haw. Apr. 27, 2012) (suggesting that mitigation remedies can be considered where plaintiffs seek broad relief so long as they point to continuing harm or harm that can be mitigated, even if a project is essentially complete);[19] Pit River Tribe v. U.S. Forest Serv., 615 F.3d 1069, 1080-81 (9th Cir. 2010) (implementing an appellate mandate providing the district court with discretion to determine an appropriate remedy for agencies' NEPA violation and noting that "[o]ur courts have long held that relief for a NEPA violation is subject to equity principles"); Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1066 (9th Cir. 2002) (finding that, even though the timber sale at issue had already been completed, the plaintiffs "broadly avoided mootness" by including a "broad request for such other relief as the court deemed appropriate" in their complaint);[20] Sierra Club v. Morton, 431 F. Supp. 11, 16 (S.D. Tex. 1975) (suggesting that the issue of remedies for a NEPA violation is discretionary, with the extent to which a

---

[19]    Here, Local 5 did seek broad relief as its complaint says it "prays that judgment be entered in its favor and against Defendants . . . and further relief as it may be entitled to."

[20]    Although the court found that the case was not moot, it also found the EIS sufficient and affirmed the district court's summary judgment in favor of defendants on that count.  303 F.3d at 1070-71.

project has completed as a factor "to be carefully weighed in considering the equities").

Therefore, we hold that the issue of remedies for a HEPA violation is one of equitable discretion. In this regard, as pointed out by the City, the environmental review process is intended to be informational and forward-looking. See Molokai Homesteaders Coop. Ass'n, 63 Haw. at 465, 629 P.3d at 1143 ("[T]he prescribed role of the EIS in the state environmental protection scheme is informational."). Even if a project has been completed, completion of a proper environmental review can provide forward-looking information, including, but not limited to, possible mitigation measures to ameliorate environmental effects.

Under the circumstances of these cases, however, we disagree with Local 5 that a court can still grant effective relief by invalidating the EAs, which, in turn, would void and/or vacate the permits for 2121 and 2139. In this regard, we note that Local 5 never moved for a temporary or permanent injunction after filing their lawsuits. Local 5 argues that it was not required to do so, citing a Ninth Circuit opinion -- Nuiqsut held that plaintiffs were not required to have filed a motion for preliminary injunction where there was a short time frame between the time the suit was filed and completion of the project. 9 F.4th at 1209.

Nuiqsut, however, is factually distinguishable and does not help Local 5. Local 5 filed its 2121 complaint in January 2013, months before the height variance for 2121 was granted and years before 2121 was completed. Local 5 filed its 2139 complaint in March 2014, months before the project started and years before it was completed. If Local 5 had filed an injunction motion, the circuit court would have been able to address whether improper segmentation was occurring and/or whether an EIS was required, instead of being asked, years later, to invalidate permits for completed projects.

Thus, whether the plaintiff moved for injunctive relief can be considered by a court in determining an equitable remedy if there has been a HEPA violation. Here, it would be inequitable to void the permits and order destruction of the towers, when Local 5 never moved for injunctive relief.

### 2. The public interest exception to the mootness doctrine also applies

These cases are also not moot because there are exceptions to the mootness doctrine. We have recognized three exceptions: (1) the "capable of repetition, yet evading review" exception; (2) the public interest exception; and (3) the "collateral consequences" exception. Cmty. Ass'ns of Hualalai, Inc., 150 Hawai'i at 253, 500 P.3d at 438. Here, the cases are not moot because the public interest exception applies.

We have held that "when the question involved affects the public interest and an authoritative determination is desirable for the guidance of public officials, a case will not be considered moot." Kaho'ohanohano v. State, 114 Hawai'i 302, 333, 162 P.3d 696, 727 (2007) (cleaned up). Under the public interest exception, we have considered the following criteria: "(1) the public or private nature of the question presented; (2) the desirability of an authoritative determination for the future guidance of public officers; and (3) the likelihood of future recurrence of the question." Id. (cleaned up).

Whether improper segmentation of an environmental review process occurred is a question of public importance. It is also one that merits an answer to provide future guidance to public agencies and judges. Finally, improper segmentation questions are likely to recur, especially for phased projects. Hence, the public interest exception to the mootness doctrine applies.

For these reasons, these cases are not moot.

**B.    The circuit court erred when it ruled that the Projects were not unlawfully segmented**

**1.    Applicable law**

Having determined that these cases are not moot, we now address whether improper segmentation occurred. This is a mixed question of fact and law, reviewed under the clearly erroneous standard. HAR § 11-200-7 provides that a group of actions

43

proposed by an applicant shall be treated as a single action

when:

> (1) The component actions are phases or increments of a larger total undertaking;
> (2) An individual project is necessary precedent for a larger project;
> (3) An individual project represents a commitment to a larger project; or
> (4) The actions in question are essentially identical and a single statement will adequately address the impacts of each individual action and those of the group of actions as a whole.

HAR § 11-200-7.[21]  The segmentation rules are to be applied using

common sense to further informed decision-making.  Kia'i Wai, 151

Hawai'i at 465, 517 P.3d at 748 (citing HRS § 343-1).

Preliminarily, for actions to have been improperly

segmented, the actions must fall within the formal definition of

an "action" under HEPA.  Kia'i Wai, 151 Hawai'i at 465, 517 P.3d

---

[21]    Although not applicable to the present case, HAR § 11-200-7 was non-substantively amended and now reads as follows:

> A group of actions shall be treated as a single action when:
>
> (1) The component actions are phases or increments of a larger total program;
>
> (2) An individual action is a necessary precedent to a larger action;
>
> (3) An individual action represents a commitment to a larger action; or
>
> (4) The actions in question are essentially identical and a single EA or EIS will adequately address the impacts of each individual action and those of the group as a whole.

HAR § 11-200.1-10 (eff. 2019).

at 748 (citing Sierra Club v. Dep't of Transp., 115 Hawai'i 299, 338, 167 P.3d 292, 331 (2007)). An "action" under HEPA means any program or project to be initiated by an agency or applicant. HAR § 11-200-2 (eff. 1996). Here, there is no dispute that the Projects constitute "actions" under HEPA. To assist us in determining whether projects are improperly segmented under HAR § 11-200-7, we have adopted the "single independent utility" and the "double" or "multiple" independent utility tests.

In Kahana Sunset, we applied HAR § 11-200-7 in finding improper segmentation of environmental review under HRS chapter 343. 86 Hawai'i 66, 947 P.2d 378. We addressed whether a proposed drainage system and a larger proposed residential development project constituted a single action, requiring a single environmental assessment to evaluate the combined impacts of both proposed actions. 86 Hawai'i at 74, 947 P.2d at 386. Applying a plain language analysis, we determined that the proposed development and drainage system constituted a single action under HAR § 11-200-7(1) and (2). Id. We reasoned that the proposed drainage system was part of the larger development project and a necessary precedent having no independent utility such that it would not be constructed except as part of the larger development. Id. We concluded that isolating only the

45

proposed drainage system component of the development for environmental assessment would be improper segmentation of the project.  Id.

Almost twenty years later, in 2016, Kilakila addressed whether a telescope project on Haleakalā was a "component" of a larger management plan of the area, such that the telescope project and the management plan constituted a single action under HAR § 11-200-7.  138 Hawaiʻi at 367-68, 382 P.3d at 191-92.  We conducted a "single action 'component' analysis" pursuant to HAR § 11-200-7(1) and Kahana Sunset.  138 Hawaiʻi at 379-80, 382 P.2d at 191-92.  We concluded that the management plan had "independent utility" from the telescope project; therefore, they did not constitute a "single action" under HAR § 11-200-7(1).  138 Hawaiʻi at 380, 382 P.2d at 192.

Our analysis of the segmentation issue in Kilakila did not discuss in detail the prevailing federal version of the then "independent utility" test applicable to segmentation issues under the National Environmental Policy Act ("NEPA"), but we stated in a footnote:

> To determine whether multiple actions should be treated as a single action under NEPA, federal courts have applied a similar "independent utility" test.  See Great Basin Mine Watch v. Hankins, 456 F.3d 955, 969 (9th Cir. 2006).  Under the "independent utility" test, "[w]hen one of the projects might reasonably have been completed without the existence of the other, the two projects have independent utility and are not 'connected' for NEPA's purposes."  Id.

134 Hawaiʻi at 379 n.32, 382 P.2d at 191 n.32.

46

Then, in 2022, in Kia'i Wai, we formally adopted the "single" and "double" independent utility tests for analyzing segmentation issues:

> We now adopt the "double" or "multiple" independent utility test. To determine whether projects are improperly segmented under HAR § 11-200-7, courts should consider whether each of the projects would take place independently. We cited the single independent utility test in Kilakila, 138 Hawai'i at 379 n.32, 382 P.3d at 191 n.32. However, in Kilakila we only considered HAR § 11-200-7(1), not any of the other three provisions in HAR § 1-200-7. See 138 Hawai'i at 379 n.32, 382 P.3d at 191 n.32. Taking HAR § 11-200-7(2) into account, we conclude the double independent utility test is necessary to effectuate HAR § 11-200-7(2), which applied where "[a]n individual project is a necessary precedent for a larger project...."
>
> Thus, in this case, we must also examine the independent utility of the Waiahi SWTP expansion and the Līhu'e developments. If the Waiahi SWTP expansion or the Līhu'e developments would not occur without the relief line, then the relief line is a "necessary precedent" to those projects under HAR § 11-200-7(2).

Kia'i Wai, 151 Hawai'i at 464, 517 P.3d at 747.

We discussed Ninth Circuit cases applying the "single" and "double" "independent utility" tests for assessing segmentation issues for "connected" actions under NEPA. Kia'i Wai, 151 Hawai'i at 463-64, 517 P.3d at 746-47. We footnoted that NEPA regulations for "connected actions" in effect at the time were analogous to HEPA's segmentation regulations.[22] We stated:

---

[22] We cited to the then 40 C.F.R. § 1508.25 (2010) indicating that actions are connected if they:

> (i) Automatically trigger other actions which may require environmental impact statements.

> ["]The crux of the [independent utility] test is whether <u>'each of two projects</u> would have taken place <u>with or without the other</u> and thus had independent utility.'" We have occasionally stated this same test alternatively as "when one of the projects might reasonably have been completed without the existence of the other, <u>the two projects have independent utility</u> and are not 'connected' for NEPA's purposes." Rather than adopting a single independent utility test, we have focused on whether "each of two projects would have taken place with or without the other," and have extended our analysis to each project. <u>Sierra Club v. Bureau of Land Mgmt.</u>, 786 F.3d 1219, 1226 (9th Cir. 2015) (citations omitted).

151 Hawai'i at 464, 517 P.3d at 747. We also footnoted, however, that "[a]lthough <u>Sierra Club v. Bureau of Land Mgmt.</u>, 786 F.3d at 1226, helps describe the difference between a 'single' and 'double' independent utility test, we do not necessarily adopt the manner in which the Ninth Circuit applied the double independent utility test in that case." 151 Hawai'i at 464 n.41, 517 P.3d at 747 n.41.

We did, however, explicitly adopt the "double" or "multiple" independent utility test, deeming it necessary "to effectuate HRS § 11-200-7(2)," which applies where an individual project is a necessary precedent for a larger project. <u>Kia'i Wai</u>, 151 Hawai'i at 464, 517 P.3d at 747. We then applied this test to the facts in <u>Kia'i Wai</u>, to examine the independent

---

> (i) Cannot or will not proceed unless other actions are taken previously or simultaneously.

> (ii) Are interdependent parts of a larger action and depend on the larger action for their justification.

<u>Kia'i Wai</u>, 151 Hawai'i at 463 n.38, 517 P.3d at 746 n.38.

48

utility of the developments.  Id.  We postulated that "the relief line is a necessary precedent for the" developments, but given the lack of information in the record regarding the developments, we left this determination for the environmental court on remand.  Id.

Thus, in both Kilakila and Kia'i Wai, we cited favorably to Ninth Circuit law regarding improper segmentation.  As explained earlier, we indicated that NEPA regulations for "connected actions" are analogous to HEPA's segmentation regulations.[23]

---

[23]    NEPA regulations differ from ours, and provide significantly more detail regarding segmentation issues.  The Ninth Circuit has held that, under NEPA, "[a] single NEPA review document is required for distinct projects when there is a single proposal governing the projects or when the projects are connected, cumulative, or similar actions under the regulations implementing NEPA." Native Ecosystems Council v. Dombeck, 304 F.3d 886, 893-94 (9th Cir. 2002).  As in that opinion, many Ninth Circuit segmentation cases construed the previous NEPA regulation, 40 C.F.R § 1508.25, which provided:

> *Scope* consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement.  The scope of an individual statement may depend on its relationships to other statements (§§ 1502.20 and 1508.28).  To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts.  They include:
>
> (a) Actions (other than unconnected single actions) which may be:
>
> (1) **Connected actions**, which means that they are closely related and therefore should be discussed in the same impact statement.  Actions are connected if they:
>
> (i) Automatically trigger other actions which may require environmental impact statements.
>
> (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.
>
> (iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) **Cumulative actions**, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.

(3) **Similar actions**, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

Now, 40 C.F.R. § 1501.3 (effective July 1, 2024), titled "Determine the appropriate level of NEPA review" provides, in relevant part:

(b) Scope of action and analysis. If the agency determines that NEPA applies, the agency shall consider the scope of the proposed action and its effects to inform the agency's determination of the appropriate level of NEPA review and whether aspects of the action are non-discretionary. The agency shall use, as appropriate, the public engagement and scoping mechanisms in §§ 1501.9 and 1502.4 of this subchapter to inform consideration of the scope of the proposed action and determination of the level of NEPA review. The agency shall evaluate, in a single review, proposals or parts of proposals that are related closely enough to be, in effect, a single course of action. The agency shall not avoid a determination of significance under paragraph (c) of this section by terming an action temporary that is not temporary in fact or segmenting an action into smaller component parts. The agency also shall consider whether there are connected actions, which are closely related Federal activities or decisions that should be considered in the same NEPA review that:

(1) Automatically trigger other actions that may require NEPA review;

(2) Cannot or will not proceed unless other actions are taken previously or simultaneously; or

(3) Are interdependent parts of a larger action and depend on the larger action for their justification.

Before this regulatory change, it appears that when assessing segmentation issues under NEPA, the Ninth Circuit applied different analyses based on whether an action was "connected," "cumulative," or "similar." In addition, Ninth Circuit opinions indicate that related proposed actions could have fallen into more than one of these categories. See Earth Island Inst. V. U.S. Forest Service, 352 F.3d 1291, at 1305-06 (9th Cir. 2003). In such cases, the Ninth Circuit applied differing category analyses to determine whether improper segmentation occurred. See id.

50

Kiaʻi Wai, 151 Hawaiʻi at 463 n.38, 517 P.3d at 746 n.38.  We also made it clear, however, that we do not necessarily adopt Ninth Circuit applications of segmentation law.  Kiaʻi Wai, 151 Hawaiʻi at 464 n.41, 517 P.3d at 747 n.41.

We now turn to analyze whether the environmental review for 2121 and 2139 were improperly segmented based on that law.

### 2.   There was improper segmentation based on HAR § 11-200-7(2) and the double independent utility test

Local 5 argues the Projects fail the double independent utility test.  We need not address the single independent utility test because the double independent utility test of HAR § 11-200-7(2) clearly applies.

Under the "double" independent utility test, we consider whether each of the projects would take place independently.  Kiaʻi Wai, 151 Hawaiʻi at 464, 517 P.3d at 747.  The double independent utility test is necessary to effectuate HAR § 11-200-

---

More recently, in Marin Audobon Society v. Federal Aviation Administration, 121 F.4th 902 (D.C. Cir. 2024), a divided panel of the United States Court of Appeals for the District of Columbia Circuit stated that the White House Council on Environmental Quality, which drafts NEPA regulations, lacked rulemaking authority because legislation, not an Executive Order of the President, was required to confer such authority.  121 F.4th at 908-09.  On January 31, 2025, a petition for rehearing en banc was denied, 2025 WL 374897 at *2 (D.C. Cir Jan. 31, 2025).  Seven of twelve judges of the en banc panel concurred on the grounds the original panel's majority ruling invalidating the regulations was not essential to the outcome of the case; in other words, it was dictum.  2025 WL 374897 at *3-4.  In addition, the original panel majority actually noted that "[t]he Court once wrote that CEQ's regulations under NEPA are `entitled to substantial deference.'"  Marin Audobon, 121 F.4th at 913, citing Andrus v. Sierra Club, 442 U.S. 347, 358 (1979).  Therefore, we assume validity of the federal regulations.  We are also free to examine previous opinions construing "connected actions" under the previous regulation to the extent we believe they may be helpful to us.

51

7(2), which provides that an "individual project is necessary precedent for a larger project."

Kia'i Wai involved the approval of a new development on the island of Kaua'i, the Līhu'e-Hanamā'ulu Master Planned Community proposal ("Līhu'e Development Plan").  151 Hawai'i at 447, 517 P.3d at 730.  Years after approval of the project, a "Water Master Plan" was created to address the water requirements of the Līhu'e Development Plan by creating a relief line to meet water transmission needs.  Kia'i Wai, 151 Hawai'i at 448, 517 P.3d at 731.  We decided that the relief line had both "independent" and "dependent" utility because it provided system redundancy and addressed existing water needs, but was also meant to create "additional capacity," serving no purpose other than "future development."  Kia'i Wai, 151 Hawai'i at 463, 517 P.3d at 746.  We thus adopted the "double" independent utility test and found that the relief line was a necessary precedent for the Līhu'e developments, that there was a clear nexus between the relief line and the developments, and the FEA appeared to have conceptualized the relief line as part of the "integrated entire project."  Kia'i Wai, 151 Hawai'i at 465, 517 P.3d at 748 (original emphasis omitted).

Under this test, we must look at each of the towers and consider whether they would have been developed independently.

In this regard, it is clear that 2121 was a necessary precedent for 2139.  The record is clear that 2139 would not have taken place independently of 2121 and that PACREP was planning 2139 even before acceptance of the FEA for 2121.

PACREP argues there was no improper segmentation because it did not sign off on a document providing it with rights to acquire or develop the Food Pantry lot until March 2013, after the November 2012 acceptance of the 2121 FEA.  Yet, the record shows PACREP's plans included the Food Pantry lot by October 2012.  Plans submitted for environmental review showed the podium jutting out from the 2121 building.  Its October 5, 2012 internal building plans, submitted with the December 2012 WSD permit for 2121, clearly showed the podium jutting eight feet into the 2139 lot.

That month, October 2012, Brendan Guerin and Jason Grosfeld discussed the possibility of pausing on 2121 to confirm how the two phases would integrate.  Jason Grosfeld, however, shut down that possibility, instructing "Not a word about phase two to anyone inc Keith [Kurahashi,]" PACREP's environmental consultant.  A few days before that an internal PACREP email indicated it planned to have Kurahashi submit the final 2121 FEA late that month and that its WSD permit application for 2121 "would ideally be submitted . . . 2 days after the final EA . . . and be accepted the following week right after the FONSI is

issued." In other words, PACREP's internal communications show it intended to segment environmental review.

PACREP maintained that the WSD permit process is a completely separate application and process from the environmental review process, so as to justify its attempt to hide the ball. We made it clear in Kilakila, however, that in a declaratory action brought to challenge an agency's determination in an environmental review challenge, judicial review is not restricted to the administrative record for the environmental review. Kilakila, 138 Hawai'i at 368, 382 P.3d at 180. This case highlights the importance of that decision. PACREP is asserting it should get by with having submitted different building plans for different purposes.

PACREP intentionally and continuously hid its plans for 2139 from Kurahashi, who was its environmental review consultant for 2121. Its personnel were instructed to keep "phase 2" plans confidential, even from their own consultants, while the 2121 DEA was pending and could still have been amended to add 2139. When environmental review specialists finally learned of PACREP's plans for 2139, they indicated significant concern regarding improper segmentation. The record shows PACREP intentionally hid its plans for 2139 from everyone it could, including its own advisors, because it did not want to have to

amend its 2121 EA to include 2139, and it wanted to go ahead with sales of 2121.

The segmentation rules are to be applied using common sense to further informed decision-making.  Kia'i Wai, 151 Hawai'i at 465, 517 P.3d at 748.  Before the 2121 FEA was approved, PACREP's internal building plans showed the first tower had a hanging podium that jutted into the 2139 site.  PACREP's argument that improper segmentation did not occur because it did not have rights to the 2139 lot until March 2013 defies common sense.  We are "left with the definite and firm conviction" that the circuit court clearly erred in ruling that PACREP did not improperly segment the 2139 Project from the 2121 Project for environmental review.  Hence, we hold that the Projects were improperly segmented under HAR § 11-200-7(2) and the double independent utility test.  Due to improper segmentation and because the case is not moot, the circuit court erred in granting PACREP's motions for summary judgment and denying Local 5's counter motions for summary judgment.

**C.   On remand, the circuit court must address whether the 2121 and 2139 FEAS sufficiently addressed environmental effects of the Projects as one combined project**

On remand, the circuit court is to address issues (2) and (3) on certiorari.  In other words, the circuit court is to address whether, under the rule of reason, the FEAs for 2121 and 2139 were sufficient in addressing the environmental effects of

the Projects as one combined project.  If not, the circuit court is to determine whether a new EA or EIS addressing the Projects must be prepared.

In this regard, the circuit court must determine whether the FEAs sufficiently identify and summarize environmental impacts and proposed mitigation measures of the Projects as a combined project.  HAR § 11-200-10(6) & (7) (eff. 1996).  HAR § 11-200-2 includes the following definition:

> "Effects" or "impacts" as used in this chapter are synonymous.  Effects may include ecological effects (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic effects, historic effects, cultural effects, economic effects, social effects, or health effects, whether primary, secondary, or cumulative.  Effects may also include those effects resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

The main environmental concern asserted by Local 5 has been that because the FEAs do not properly disclose the potential uses of the condominium units as permanent residences, the representation that the Projects create over 700 hotel jobs is illusory.  The City counters that mitigation measures need only be considered to address negative impacts of a proposed action, not to "maximize community benefits."  The definition of "impacts" in HAR § 11-200-2, however, shows that the City is wrong; "impacts" include "economic," "social," and "health" impacts, whether primary, secondary, or cumulative.  As we have pointed out:

> The Hawaiʻi law, by particularizing the subjects of inquiry, calls for a broader range of information than NEPA. It also is more expansive than the Model State Environmental Policy Act in that the model law, unlike ours, appears to preclude the consideration of social and economic implications by limiting the environmental impacts and effects includable in an EIS to the physical. Moreover, HRS Chapter 343 is wider in scope than the federal or the typical state analogue, for the state law covers private actions in certain defined situations and areas. Nevertheless, the prescribed role of the EIS in the state environmental protection scheme is informational.

Molokai Homesteaders Co-op. Ass'n, 63 Haw. at 465, 629 P.2d at 1143 (cleaned up). Whether 700 union jobs will continue to exist is an economic or social impact.

The record indicates there is no requirement that the condominium units be maintained in a hotel pool. Also, the Projects are called the Ritz-Carlton Residences, Waikīkī Beach, not the Ritz-Carlton Hotel. Unexpected world events can occur. The record does not indicate anything prohibiting owners from removing units from the hotel pool and taking up long-term residence in their units. In addition, the record suggests that the analysis of parking and other environmental impacts of the Projects were based on the overwhelming majority of units remaining within a hotel pool.

Hence, the circuit court must analyze whether the FEAs meet the rule of reason in addressing environmental impacts, as defined by Hawaiʻi law, of the Projects as one combined project. If not, the circuit court must determine whether a new EA or EIS addressing the Projects must be prepared.

## V. Conclusion

HEPA is an integral law relating to environmental quality protecting our Article XI, Section 9 right to a clean and healthful environment. The Preamble to our Constitution also says "We, the people of Hawaii, grateful for Divine Guidance, and mindful of our Hawaiian heritage and uniqueness as an island State, dedicate our efforts to fulfill the philosophy decreed by the Hawaii State motto, 'Ua mau ke ea o ka aina i ka pono.'"

PACREP's deceptive segmentation of environmental review not only violated the law, it simply was not pono.

For the reasons discussed above, we vacate the following filings in the circuit court [orders] in both Civil Nos. 1CC131000047 and 1CC141000753:

1. Orders filed on May 6, 2022 entitled "Order (1) Granting Defendant PACREP LLC's Motion for Summary Judgment (filed February 19, 2016) and Defendant City and County of Honolulu's Substantive Joinder to Defendant PACREP LLC's Motion for Summary Judgment, Filed February 19, 2016 (filed February 23, 2016), and (2) Denying Plaintiff's Counter-Motion for Summary Judgment (filed March 8, 2016)";

2. Orders filed on May 6, 2022 entitled "Order Denying Plaintiff's Motion for Summary Judgment Regarding Unlawful Segmentation of the Project, Filed February 19, 2016";

3.    Orders filed on June 6, 2022 entitled "Order Granting Defendants PACREP LLC and PACREP 2 LLC's Supplemental Motion for Summary Judgment on Local 5's Complaints Filed January 7, 2013 and March 28, 2014 based on Mootness (Filed March 16, 2022)"; and

4.    Final Judgment, filed on September 15, 2022.

We remand to the circuit court for further proceedings consistent with this opinion.


Gregory W. Kugle and              /s/ Mark E. Recktenwald
Clint K. Hamada for
plaintiff/appellant               /s/ Sabrina S. McKenna

Terrence J. O'Toole,              /s/ Todd W. Eddins
Sharon V. Lovejoy, and
Maile S. Miller,                  /s/ Lisa M. Ginoza
for defendant/appellee
PACREP                            /s/ Vladimir P. Devens



Brad T. Saito,
for defendant/appellee
City and County of
Honolulu